**NATWEST USA CREDIT CORP., Plaintiff,**

v.

**ALCO STANDARD CORPORATION and Westinghouse Credit Corporation, Defendants.**

**No. 92 CIV. 9104 (LAP).**

United States District Court, S.D. New York.

July 19, 1994.

Cory E. Friedman, Winston & Strawn, New York City, for Natwest USA Credit Corp.

Steven Edward Bizar, Kelley, Drye & Warren, New York City, Steven E. Bizar, Howard D. Scher, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Alco Standard Corp.

Simeon Harold Baum, Semel, Boeckmann & Skydel, Clifford H. Schoenberg, Rosenman & Colin, Mark D. Shepard, Donald R. Rooney, Jr., Miller, Singer, Raives & Brandes, P.C., New York City, Mark D. Shepard, Buchanan Ingersoll Prof. Corp., Pittsburgh, PA, for Westinghouse Credit Corp.

## OPINION AND ORDER

PRESKA, District Judge.

This interpleader action presents the question of whether Alco Standard Corporation ("Alco") or Westinghouse Credit Corporation ("Westinghouse") is entitled to a priority over the right to be repaid from the interpleader funds. After a bench trial, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Judgment shall be entered in favor of interpleader defendant Westinghouse.

### FINDINGS OF FACT

*Introduction*

1. Natwest USA Credit Corporation ("Natwest") commenced the instant action by filing a complaint for interpleader on December 16, 1992 against Alco and Westinghouse.

The interpleader action concerns the sum of $1,250,000.00 (the "Interpleader Funds"). *See* Amended Complaint for Interpleader ¶ 28.

2. On or about September 30, 1987, Toscany, Inc. ("Toscany") and Alco entered into an agreement whereby Toscany agreed to buy and Alco agreed to sell, all of the assets used or held for use in the Toscany Imports Division of Alco. *See* Transcript from Trial ("T.T.") at 12–13; November 3, 1987 Loan Agreement between Toscany and Natwest § 3.22 ("Joint Exhibit B").

3. Toscany was incorporated by certain managers of Alco's Toscany Imports Division for the purpose of acquiring the assets of that division. *See* T.T. at 12–13, 59.

4. Natwest was the principal lender to Toscany of funds for Toscany's acquisition and operation of the Toscany Imports Division of Alco. *See* T.T. at 13. Westinghouse was also a lender to Toscany of funds for Toscany's acquisition and operation of the Toscany Imports Division of Alco, but the Westinghouse loans to Toscany were subordinated to the Natwest loans ("Subordinated Loans"). *See* T.T. at 81; Westinghouse Answer to Amended Complaint for Interpleader, Ex. A.

*The Loan Agreement*

5. On or about November 3, 1987, Natwest and Toscany entered into a Loan Agreement (the "Loan Agreement"). *See* Joint Exhibit B at 1. Toscany is referred to in the Loan Agreement as "Borrower." *See id.* Natwest is referred to in the Loan Agreement as "Lender." *See id.* Under the terms of the Loan Agreement, Natwest agreed to provide Toscany with a credit facility under which Toscany could obtain loans and other financial accommodations (collectively referred to as the "Loans") in an aggregate principal amount of up to $16,000,-000.00 at any one time. *See id.,* § 2.1 at 14.

6. The Loan Agreement required Toscany to repay Natwest, and only Natwest, for all funds borrowed thereunder. *See e.g.,* Joint Exhibit B at 17–21.

7. The Loan Agreement defined the term "obligations" as

all the *indebtedness,* liabilities and obligations *of the Borrower [Toscany] to the Lender [Natwest],* of any and every kind and nature, whether or not currently contemplated, including, without limitation those arising under this Agreement and every other Loan Document including, the Credit Accommodation Obligations and any loss, cost or expense, whether heretofore, now or hereafter owing, arising, due, or payable from the Borrower [Toscany] to the Lender [Natwest] and howsoever evidenced, created, incurred, acquired, or owing, whether primary, secondary, direct, contingent, fixed, or otherwise, including obligations of performance, and including, without limitation, principal, interest, loan fees, charges, expenses, attorneys' fees, and other amounts chargeable to the Borrower [Toscany] by the Lender [Natwest], the Loans, future advances made to or for the benefit of the Borrower [Toscany], any financial accommodation extended or obtained by the Lender [Natwest] to or for the benefit of the Borrower [Toscany] by which the Lender [Natwest] issues in its own name or by which the Lender [Natwest], as customer, causes any bank or other financial institution, as issuer, to issue, a credit or letter of credit, as defined in the Uniform Commercial Code, that obligates the issuer to honor drafts or demands for payment made by any beneficiary designated under such letter of credit.

*See* Joint Exhibit B (emphasis added).

8. The Loan Agreement defined the term "[i]ndebtedness," as used thereunder, as

with respect to any Person, *all* (i) *liabilities or obligations, direct and contingent, which in accordance with generally accepted accounting principles would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person* at the date as of which indebtedness is to be determined, including, without limitation, contingent liabilities which, in accordance with such principles, would be set forth in a specific Dollar amount on the liability side of such balance sheet, and Capitalized Lease Obligations of such Person; (ii) liabilities or obligations of others for which such Person is directly or indirectly liable, by way of guarantee (whether by direct guarantee, suretyship, discount, endorsement, take-or-

pay agreement, agreement to purchase or advance or keep in funds or other agreement having the effect of a guarantee) or otherwise; and (iii) liabilities or obligations secured by Liens on any assets of such Person, whether or not such liabilities or obligations shall have been assumed by it. *See* Joint Exhibit B at 6–7. (emphasis added).

9. As defined under the Loan Agreement, the definition of the term "obligations" incorporates the definition of the term "indebtedness". *See* Joint Exhibit B at 8. As defined under the Loan Agreement, the definition of the term "indebtedness" includes any indebtedness to Natwest that would appear on Toscany's balance sheet. *See* T.T. at 65.

*The Guaranty*

10. Prior to entering into the Loan Agreement, Natwest advised Alco that it would not go forward with the Loan Agreement and provide the Loans to Toscany unless Alco agreed to provide a guaranty to Natwest guaranteeing Toscany's obligations under the Loan Agreement. *See* T.T. at 14, 20–21. Natwest made the aforementioned demand for a guaranty upon Alco because Natwest determined that the assets of the Toscany Imports Division did not provide adequate security for the Loans. *See* T.T. at 59–60.

11. Alco agreed to provide the guaranty to Natwest because: (i) Alco believed that, unless it did so, Natwest would not provide the Loans to Toscany; and (ii) Alco expected to derive benefits from Natwest's Loans to Toscany. *See* T.T. at 60, 62; November 2, 1987 Guaranty at 1 ("Joint Exhibit C").

12. On or about November 2, 1987, Alco executed and delivered to Natwest a guaranty ("Guaranty") wherein Alco unconditionally guaranteed, until January 31, 1991, Toscany's obligations to Natwest under the Loan Agreement and other related documents up to a maximum amount of $1,000,000.00. *See* Joint Exhibit C at 1.

13. When Alco executed the Guaranty, it had no interest in the source of the funds obtained by Natwest to make the Loans to Toscany. *See* T.T. at 40.

14. The Guaranty refers to Toscany as the "Borrower," Natwest as the "Lender,"

and Alco as the "Guarantor." *See* Joint Exhibit C at 1.

15. Paragraph 1 of the Guaranty describes Alco's obligation thereunder, stating in pertinent part:

1. (a) The Guarantor [Alco] hereby irrevocably and unconditionally guarantees to the Lender [Natwest] the due payment and performance of the *indebtedness* and other liabilities and *obligations* of the Borrower [Toscany] to the Lender [Natwest], whether or not currently contemplated or now or hereafter existing, due or to become due, direct or contingent, joint, several or independent, secured or unsecured and whether matured or unmatured, including without limitation, (i) under, arising out of or in any way connected with the Loan Agreement and all of the other Loan Documents (as defined in the Loan Agreement), and (ii) the Credit Accommodation Obligations (as defined in the Loan Agreement) (all of the liabilities included in this Paragraph 1 are hereinafter collectively referred to as the "Guaranteed Obligations"). This is a guaranty of payment and not of collection, and is the primary obligation of the Guarantor [Alco]; and the Lender [Natwest] may enforce this Guaranty against the Guarantor [Alco] without any prior enforcement of the Guaranteed Obligations against the Borrower.

(b) Anything in this Guaranty notwithstanding, the maximum amount of the obligation of the Guarantor [Alco] to the Lender [Natwest] hereunder shall be $1,000,000 in the aggregate notwithstanding the aggregate amount of the Guaranteed Obligations at any time payable to the Lender [Natwest] . . .

Joint Exhibit C ¶ 1 (emphasis added).

16. Under the language of paragraph 1 of the Guaranty, Alco guaranteed the entire amount of the Loans which Natwest made to Toscany under the Loan Agreement, with the maximum amount of Alco's obligation limited to $1,000,000.00. *See id.;* T.T. at 24. Paragraph 5 of the Guaranty provides, in pertinent part:

So far as the Guarantor is concerned, the Lender may, at any time and from time to

time, without the consent of, or notice to the Guarantor, and without impairing or releasing any of the rights or obligations of the Guaranty hereunder or under the other Loan Documents, (as defined in the Loan Agreement), upon or without any terms or conditions and in whole or in part: (a) modify or change the manner, place or terms of, and/or change or extend the time of payment of, renew or alter, any of the Guaranteed Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Guaranteed Obligations as so modified, changed, extended, renewed or altered ... (d) settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and *subordinate the payment of all or any part [of the Guaranteed Obligations] to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Lender and the Guarantor....*

Joint Exhibit C ¶5 (emphasis added).

17. Alco admits that, under the plain language of paragraph 5(d) of the Guaranty, Natwest had the right and authority to give Westinghouse priority over repayment to Natwest or Alco. *See* T.T. at 35.

18. Paragraph 7 of the Guaranty specifically addresses and limits Alco's right to be subrogated to the rights of Natwest under the Loan Agreement. This paragraph states, in relevant part:

7. Notwithstanding any payment hereunder, until such time as the Guaranteed Obligations have been paid in full, the Guarantor [Alco] hereby irrevocably waives, for the benefit of the Lender [Natwest] any and all rights which it presently has, or may hereafter have, to be subrogated to the rights of the Lender [Natwest] against the Borrower [Toscany] with respect to any such indebtedness of the Borrower [Toscany] to the Lender [Natwest].

*See* Joint Exhibit C ¶7.

19. As defined under the Guaranty, the term "Guaranteed Obligations" includes all of Toscany's indebtedness, liabilities and obligations to Natwest under the Loan Agreement. *See* Joint Exhibit C ¶1(a). Toscany's indebtedness, liabilities and obligations to Natwest under the Loan Agreement include Toscany's obligation to repay Natwest for the total amount of the Loans. *See* Joint Exhibit B, §§ 2.5–2.8, 2.11.

20. Alco's guaranty served as collateral for the loans made to Toscany under the Loan Agreement and, therefore, any payment by Alco under the Guaranty served to reduce the total amount owed by Toscany to NatWest under the Loan Agreement. *See* T.T. at 82, 138–39.

*The Amended and Restated Loan Agreement*

21. In December of 1990, Natwest's Loans to Toscany were refinanced. *See* T.T. at 83. The refinancing occurred because Toscany was in default under the Loan Agreement and Natwest, therefore, refused to provide any further advances to Toscany under the Loan Agreement. *See id.*

22. Westinghouse, which provided the Subordinated Loans to Toscany, concluded that it was unlikely that it would be repaid by Toscany for the Subordinated Loans unless Toscany continued as a viable business and generated a positive cash flow. *See* T.T. at 140–141. Accordingly, Westinghouse decided that it was in its best interest to negotiate a transaction with Natwest that would enable Toscany to borrow the full amount of the Loans that were to have been made available to it by Natwest under the Loan Agreement. In this way, Toscany could increase its inventory prior to the Christmas season and thereby realize revenue and profits that would enable Toscany to stay in business. *See id.* at 141.

23. Westinghouse's negotiations with Natwest resulted in the refinancing of Natwest's Loans to Toscany. *See id.*

24. On December 3, 1990, Toscany and Natwest entered into an Amended and Restated Loan Agreement (the "Amended Loan Agreement"). *See* Amended Loan Agreement at 1 ("Joint Exhibit D"). The Amended and Restated Loan Agreement increased the amount of Natwest's credit facility under

the original Loan Agreement to $16,500,-000.00. *See id.* at 1, 15.

25. The Amended Loan Agreement contains the same definitions of the terms "obligations" and "indebtedness" as the Loan Agreement. *Compare* Joint Exhibit B at 6, 8 *with* Joint Exhibit D at 6, 8.

26. Toscany is referred to in the Amended Loan Agreement as the "Borrower." *See* Joint Exhibit D at 1.

27. Natwest is referred to in the Amended Loan Agreement as the "Lender." *See id. passim.*

28. In conjunction with the Amended Loan Agreement, Westinghouse and Natwest entered into a December 3, 1990 Amended and Restated Junior Participation Agreement ("Participation Agreement"), discussed below. *See* Participation Agreement ("Joint Exhibit E").

29. In addition, Alco executed a December 3, 1990 letter agreement ("Letter Amendment"), which amended the terms of the Guaranty, as discussed below. *See* Letter Amendment ("Joint Exhibit F").

30. The Amended Loan Agreement refers to the Participation Agreement, stating:

"Westinghouse Junior Participation Agreement"—the agreement by and between Westinghouse and the Lender [Natwest] of even date herewith covering the agreement by Westinghouse to purchase a $3,000,000.00 junior and subordinate participation in the Loans on the terms and conditions set forth therein.

Joint Exhibit D at 13.

31. The Amended Loan Agreement also refers to the Letter Amendment that Alco executed, amending the terms of the Guaranty:

(a) Alco has heretofore simultaneously with the execution and delivery of the Original Loan Agreement, executed and delivered to the Lender a Guaranty (herein referred to as the "Alco Guaranty") pursuant to which Alco unconditionally guaranteed to the Lender the due payment and performance by the Borrower of all the Obligations on the terms and conditions set forth therein; and (b) Simultaneously with the execution and delivery of this Agreement, *Alco shall execute and deliver an amendment to the Alco Guaranty* (the "Alco Guaranty Amendment") *pursuant to which Alco shall (i) confirm that the Alco Guaranty guarantees the obligations of the Borrower arising under this Amended and Restated Loan Agreement* and (ii) extend the termination date of the Alco Guaranty two years from January 3, 1991 to January 31, 1993.

Joint Exhibit D ¶ 2.17, at 24 (emphasis added).

*The Amended Guaranty*

32. The Letter Amendment, which Alco executed and delivered to Natwest, amended the terms of Alco's Guaranty by extending the effective date of the Guaranty for two years or until January 31, 1993. *See* Joint Exhibit F ¶ 2. The Letter Amendment refers to the Amended Loan Agreement as "Loan Agreement." *See id.* at (iii).

33. Paragraph (iii) on page 1 of the Letter Amendment specifically refers to "the Note in the principal amount of $16,500,000 dated the date hereof issued by the Borrower [Toscany] and payable to the Lender [Natwest]." *See* Joint Exhibit F ¶ (iii), at 1.

34. The Letter Amendment amended the definition of "Guaranteed Obligations" under the Guaranty to read as follows:

All references in the Guaranty to "Guaranteed Obligations" include, without limitation, all of the indebtedness, liabilities and obligations of the Borrower under the Loan Agreement and Note.

*See* Joint Exhibit F ¶ 1. Therefore, under the Letter Amendment, the definition of Guaranteed Obligations was changed to include the entire $16,500,000 loan.

35. Alco agreed to provide the Letter Amendment to Natwest because Natwest made it clear to Alco that, unless Alco agreed to extend the effective date of the Guaranty, Natwest would call upon Alco to make payment under the Guaranty before the original termination date thereof. *See* T.T. at 17, 55–56.

36. The Letter Amendment refers to Toscany as the "Borrower," to "Natwest" as the

"Lender" and to Alco as the "Guarantor." *See* Joint Exhibit F at 1. The Letter Amendment did not change the language contained in paragraph 7 of the Guaranty except to substitute therein the amended definition of "Guaranteed Obligations." *See* T.T. at 30. Accordingly, under paragraph 7 of the Guaranty, Alco waives its right to subrogation until the entire $16,500,000 has been paid in full.

37. Although the Letter Amendment was executed at the same time as the Participation Agreement, Alco did not amend the definition of Guaranteed Obligations so as to limit its waiver of subrogation only until "Natwest's Share of the Loans" (as defined in the Participation Agreement) had been repaid. *Id.* at 28.

38. Under the interpretation urged by Alco in this case, if Natwest sold participations in the entire amount of the Loans under the Amended Loan Agreement, Alco's Guaranty would be eliminated. *See* T.T. at 43–44.

*The Participation Agreement*

39. Natwest and Westinghouse are the only parties to the Participation Agreement. *See* Joint Exhibit E *passim;* T.T. at 98. Pursuant to the terms of the Participation Agreement that Westinghouse and Natwest executed, Westinghouse agreed to accept a $3,000,000.00 participation (the "Participation") in the Loans that Natwest agreed to provide to Toscany under the Amended and Restated Loan Agreement. *See* Joint Exhibit E ¶ 1.

40. According to the terms of the Participation Agreement, Westinghouse was obligated to fund this Participation by paying up to an aggregate of $3,000,000.00 to Natwest upon its demand. *See id.* § 1.

41. Section 2 of the Participation Agreement sets forth an order of priority which Natwest is obligated to follow in applying all funds received or held by it from Toscany or out of Toscany's assets or as proceeds of the Collateral. Section 2 states, in pertinent part:

After the date of the funding by you [Westinghouse] of the Participation (the "Funding Date"), all monies received or held us by us [Natwest] on or at any time from the Customer [Toscany] or out of its assets or as proceeds of any Collateral ... shall be applied, *first,* to the payment in full of the costs and expenses (including attorney's fees) incurred by us [Natwest] in effecting the recovery or collection of such monies or enforcing our [Natwest's] rights and remedies under the Loan Documents, *second,* to the payment in full of all fees, indemnities and other obligation of [Toscany] to us under any Loan Document (other than the obligation to pay principal and interest on the Loans), *third,* to the payment in full of interest accrued on Natwest's Share of the Loans at the rate specified in the Loan Agreement and the Note (the "Interest Rate"), *fourth,* to the payment of all principal then due (whether in ordinary course, by acceleration or otherwise) on Natwest's Share of the Loans, *fifth,* to the payment in full of interest accrued on the Participation at the Interest Rate, *sixth,* to the repayment in full of the principal of Natwest's Share of the Loans, and *seventh,* to the repayment in full of the Participation.

Joint Exhibit E, § 2 (emphasis added).

42. Section 2 of the Participation Agreement established the order of repayment as between Natwest and Westinghouse from the funds that Natwest received in repayment of the Loans. *See* T.T. at 99. Section 2 does not provide for the repayment of monies which Alco paid to Natwest pursuant to the Guaranty because the Participation Agreement did not affect Alco's rights or obligations under the Guaranty. *See id.* at 90, 99.

43. Alco admits that neither the Guaranty nor the Letter Amendment contains any language creating an obligation on the part of Natwest to collect money from Toscany for the benefit of Alco. *See* T.T. at 33.

*Nature and Effect of Westinghouse's Participation*

44. A participation is not a loan. *See* T.T. at 85–86, 130. To the contrary, a participation is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to

the lender; the lender utilizes the funds to make its loans to the borrower. *See id.*

45. The participant is not a lender to the borrower and has no contractual relationship with the borrower. *See id.*

46. The participant, by purchasing a participation in the lender's loans to the borrower, obtains the benefits of the lender's security interest and priority of payment. *See id.*

47. Consistent with the nature and characteristics of a loan participation, the Participation Agreement did not affect Toscany's obligations to Natwest under the Amended Loan Agreement or Alco's obligations to Natwest under the Guaranty. *See* T.T. at 100.

48. As Alco admits, the Participation Agreement did not create a lender-borrower relationship between Toscany and Westinghouse under the Amended Loan Agreement. *See* T.T. at 66.

49. The only lender under the Amended Loan Agreement, both before and after Westinghouse's purchase of the Participation, was Natwest. *See* Joint Exhibit D *passim.*

50. Westinghouse's Participation provided part of the funds which Natwest loaned to Toscany under the Amended Loan Agreement. *See* T.T. at 133.

51. The Participation Agreement, therefore, did not increase the amount of funds available to Toscany under the Amended Loan Agreement. *See* T.T. at 40.

52. The amount of the "Guaranteed Obligations" that had to be paid in full before Alco could be subrogated to Natwest's rights against Toscany was not increased or decreased by Westinghouse's purchase of the Participation. *Id.*

53. Because Natwest was the only Lender under the Original and Amended Loan Agreement and Westinghouse's Participation did not affect the amount of the "Guaranteed Obligations" (as defined in the Guaranty), Natwest's repayment of Westinghouse's Participation prior to Alco's receiving repayment for its Guaranty is not inconsistent with the "for the benefit of the Lender" language in paragraph 7 of the Guaranty.

54. Alco admits that Toscany's balance sheet showed the same amount of indebtedness owing to Natwest both before and immediately after Westinghouse purchased the $3,000,000.00 Participation in Natwest's Loans to Toscany. *See* T.T. at 65.

55. The Participation Agreement specifically states that Westinghouse has no right to proceed directly against Toscany or the Collateral to recover for its Participation. *See* Joint Exhibit E, § 8(a); T.T. at 174.

56. Paragraph 8 of the Participation Agreement also explicitly provides that Toscany is not deemed to be a third party beneficiary of the Participation Agreement. *See* Joint Exhibit E, § 8(b).

57. The Participation Agreement was not an assignment of the Guaranty because Westinghouse had no right to call upon and/or demand Alco to pay under the Guaranty. *See* T.T. at 99, 174.

58. The Participation Agreement obligates Natwest to repay Westinghouse for its Participation from all monies received or held by Natwest from Toscany or out of Toscany's assets or as proceeds of the Collateral. *See* Joint Exhibit E, § 2.

59. Prior to the execution of the Participation Agreement, Alco had the right to be repaid for the $1,000,000.00 that it paid pursuant to the Guaranty only after Natwest has been repaid in full for the Loans. After the execution of the Participation Agreement, Alco still had the right to be repaid for the $1,000,000.00 that it paid pursuant to the Guaranty after Natwest has been repaid in full for the Loans. *See* Joint Exhibit C ¶ 7; Joint Exhibit F at 1–2.

60. When Natwest has been repaid in full for the Loans, including the $3,000,000.00 representing Westinghouse's Participation, the payments contemplated under steps one through seven of section 2 of the Participation Agreement will have been made. *See* T.T. at 123.

61. Accordingly, only when Natwest has been repaid in full for the Loans, will Alco be entitled to step into Natwest's shoes as a subrogor. *See* T.T. at 153–154.

*Priority of Repayment of Participant (West-inghouse) Over Repayment of Guarantor (Alco)*

62. Among professionals in the corporate finance field, it is generally understood and accepted that the participant in a loan is to be repaid for its participation before the guarantor is repaid for monies extended pursuant to the guaranty. *See* T.T. at 89.

63. Westinghouse entered into the Participation Agreement with the understanding that it would be repaid for the entire amount of its Participation before Alco would be repaid for the monies that it paid pursuant to the Guaranty. *See* T.T. at 90.

64. If Westinghouse had been told that Alco would be repaid for its Guaranty before Westinghouse was repaid for its Participation, Westinghouse would not have approved the Participation Agreement, or would have insisted that the Participation Agreement be for an amount less than $3,000,000.00. *See* T.T. at 142.

65. Alco admits that, if Natwest had borrowed the funds that it used to make the Loans to Toscany from another bank like Citibank and Natwest used loan repayments from Toscany to repay Citibank, Alco would have no right to interfere with Natwest's payments to Citibank or to be repaid for the monies that it paid under the Guaranty before Citibank. *See* T.T. at 63–64.

66. Alco had reason to know of the generally understood customs, usages or practices regarding participations. *See* T.T. at 15, 24, 49, 50, 61.

67. The term "Loans," as defined by the Participation Agreement, means "the loans, advances or other financial accommodations made by [Natwest] to [Toscany] from time to time under the Loan Agreement." *See* Joint Exhibit E at 1.

68. The phrase "Natwest's Share of the Loans," as defined by the Participation Agreement, means "the excess, if any, of the principal amount of the Loans outstanding from time to time over the amount of the Participation...." *See id.* at 2.

69. This definition in the Participation Agreement does not create two loans; rather Natwest retains its right to receive payment from Toscany even after its "share of the loans" has been received, but it has a contractual and fiduciary obligation under the Participation Agreement to pay those monies to Westinghouse. *See* T.T. at 125–128.

70. The money that is the subject of this interpleader action constitutes "monies received or held by [Natwest] ... from the Customer [Toscany] or out of its assets or as proceeds of any Collateral...." *See* Joint Exhibit E, § 2.

71. Consistent with Natwest's obligation to repay Westinghouse for the Participation from monies that Natwest receives in repayment of the Loans, section 5 of the Participation Agreement explicitly requires Natwest to service and manage its Loans to Toscany and to enforce its rights in the collateral securing the Loans *until the Loans have been paid in full.* *See id.* § 5.

72. Section 5 states, in pertinent part:
5. (a) Except as provided in clause (b) of this Section 5, *the account of the Customer and all transactions in connection herewith shall be conducted solely in our name,* without charge to you for our administrative or clerical expenses except as provided in paragraph 4 above. *So long as any Loans are outstanding we shall service and manage the Loans and handle all matters concerning the Collateral* (including the protection, preservation and disposition thereof) in accordance with our usual practice in managing our own affairs in the ordinary course of business; ...

(b) *Upon payment in full of Natwest's Share of the Loans* and all other amounts owing to us under the Loan Agreement, the Note and the other Loan Documents (other than the principal amount of the Participation and interest accrued thereon), *we will continue to take all reasonable steps to enforce our rights in the Collateral for your benefit* in accordance with clause (a) of this Section 5.

Joint Exhibit E, § 5 (emphasis added).

73. As defined under the Participation Agreement, the term "Loans" includes the $3,000,000.00 that Natwest loaned to Toscany under the Amended and Restated Loan

Agreement after receiving the money from Westinghouse pursuant to the Participation Agreement. *See* Joint Exhibit E at 2.

74. Pursuant to section 5 of the Participation Agreement, Natwest has a contractual obligation to continue to manage and service the Loans, and to take all reasonable steps to enforce its rights in the Collateral until Natwest has been repaid in full, not only for Natwest's Share of the Loans, but for the entire amount of the Loans, including the $3,000,000.00 representing Westinghouse's Participation in the Loans.

75. There is no provision in the Loan Agreement, the Amended Loan Agreement, the Guaranty or the Letter Amendment that precluded Natwest from selling participations in its Loans and/or required Natwest to obtain the consent of Toscany or Alco prior to selling participations in the Loans. *See* T.T. at 36, 40.

### The Reimbursement Agreement

76. On December 3, 1990 (the same date as the Amended Loan Agreement, Participation Agreement and Letter Amendment), Westinghouse and Alco executed the Reimbursement Agreement. *See* Joint Stipulation ¶ 21. The Reimbursement Agreement established, as between Westinghouse and Alco, the timing of their respective obligations under the Guaranty and the Amended and Restated Participation Agreement. *See* Joint Exhibit G at 1.

77. The Reimbursement Agreement did not affect the parties' repayment rights or the priority of repayment between Alco and Westinghouse. *See* T.T. at 183.

78. If Westinghouse had received an assignment of Alco's Guaranty from Natwest, the Reimbursement Agreement would have been unnecessary; Westinghouse would simply have demanded that Alco make payment of its $1,000,000.00 under the Guaranty before Westinghouse paid its $3,000,000.00 under the Participation Agreement. *See* T.T. at 180–181, 184.

79. Thus, Natwest's sale of the Participation to Westinghouse did not violate paragraph 3 of the Letter Amendment which prohibits Natwest from assigning its rights under the Alco Guaranty.

### Transactions Arising Under the Agreements

80. On March 29, 1991, Natwest exercised its rights under the Participation Agreement and demanded that Westinghouse pay the full amount of the Participation, namely $3,000,000.00, to Natwest. *See* Joint Stipulation ¶ 23.

81. Pursuant to paragraph 1.1 of the Reimbursement Agreement, Westinghouse requested that Alco pay $1,000,000.00 to Westinghouse, representing Alco's payment under the Alco Guaranty. *See id.* ¶ 24.

82. After Alco paid $1,000,000.00 to Westinghouse, Westinghouse forwarded $3,000,000.00 to Natwest under the terms of the Participation Agreement. *See id.* ¶ 25.

83. On October 9, 1991, Natwest demanded that Alco make payment to Natwest under the Alco Guaranty, as amended. *See id.* ¶ 26. Thereafter, Westinghouse, on Alco's behalf, paid $1,000,000.00 to Natwest under the terms of the Reimbursement Agreement. *See id.* ¶ 27.

84. Upon completion of the above-described transactions, Alco had paid $1,000,000.00 to Natwest under the terms of the Guaranty, as amended by the Letter Agreement dated December 3, 1990, and Westinghouse had paid $3,000,000.00 to Natwest under the terms of the Participation Agreement. *See id.* ¶ 28.

### Post–Funding Status of Participation and Guaranty

85. Upon completion of the above-described transactions, there were still only two levels of debt: (a) Natwest's Loans to Toscany, that is, the senior debt; and (b) Westinghouse's Subordinated Loans to Toscany. *See* T.T. at 87–88.

86. Alco's payment of the $1,000,000.00 pursuant to the Guaranty reduced the total amount of Toscany's indebtedness to Natwest by $1,000,000.00. *See* T.T. at 139.

87. Upon Alco's payment of the $1,000,000.00 under the Guaranty, Alco became an unsecured creditor of Toscany, having an unsecured contract and/or indemnity claim against Toscany for $1,000,000.00. *See* T.T. at 88, 140.

88. Alco's payment of the $1,000,000.00 under the Guaranty did not provide Alco with any claim against Natwest. *See* T.T. at 36.

89. When Westinghouse paid $3,000,-000.00 to Natwest pursuant to the Participation Agreement, Westinghouse did not acquire a direct claim against Toscany; to the contrary, Westinghouse only obtained a derivative claim *through* Natwest, which only Natwest has the right to pursue. *See* T.T. at 88, 147.

*Toscany's Bankruptcy*

90. On November 1, 1991, Toscany filed for bankruptcy under Chapter 11 of the Bankruptcy Code. *See* Joint Stipulation ¶ 9.

91. In its Schedule of Creditors (the "Schedule of Creditors"), Toscany listed Alco's claim against it for $1,000,000.00, representing the amount which Alco paid under the Guaranty, as an unsecured trade debt. *See* T.T. at 92–93. *See also* the Schedule of Creditors, which is attached to Toscany's voluntary petition for bankruptcy as Exhibit "B."

92. In the Schedule of Creditors, Westinghouse's Participation was listed as part of the secured debt owed by Toscany to Natwest. *See* T.T. at 93. This listing is consistent with the priority of repayment of Westinghouse's Participation over repayment of Alco's Guaranty. *See* T.T. at 93.

93. Toscany is in liquidation, winding up its affairs in advance of dissolution. *See* Joint Stipulation ¶ 10.

94. On the date Toscany filed for bankruptcy, it owed $6,668,733.70 to Natwest under the Amended Loan Agreement; since that date, Toscany has repaid to Natwest $5,942,087.29 under the Amended Loan Agreement. *See id.* ¶¶ 31–32. Toscany has not repaid Natwest in full for the Loans which Natwest made under the Amended Loan Agreement. *See id.;* T.T. at 173.

95. The Guaranteed Obligations (as that term is defined in the Guaranty and Letter Amendment) have not been repaid in full. *See* Joint Stipulation ¶¶ 31–32.

96. As such, the condition precedent to Alco's right to be subrogated to the rights of Natwest against Toscany has not yet been satisfied. *See* Joint Exhibit C ¶ 7.

97. While the Guaranteed Obligations have not been paid in full, Natwest has received from Toscany, or out of its proceeds or as proceeds of the Collateral, monies in excess of Natwest's Share of the Loans (as defined in the Participation Agreement). *See* T.T. at 158.

98. Natwest is obligated, pursuant to section 2 of the Participation Agreement, to use any and all funds which it receives from Toscany, or out of its proceeds or as proceeds of the Collateral, in excess of Natwest's Share of the Loans (as defined in the Participation Agreement), to repay Westinghouse for the Participation. *See* T.T. at 173.

99. The Interpleader Funds constitute monies which Natwest received from Toscany, or out of its proceeds or as proceeds of the Collateral, in repayment of the Loans under the Amended Loan Agreement; therefore, Natwest is obligated to use the Interpleader Funds to repay Westinghouse for the Participation. *See* T.T. at 173.

100. Natwest failed to pay the Interpleader Funds to Westinghouse because Alco was threatening to sue Natwest if it did so. *See* T.T. at 161; Amended Complaint for Interpleader ¶ 25.

101. Acceptance of Alco's position in this case would result in Westinghouse's being without any legal means of obtaining repayment of its entire Participation. *See* T.T. at 148–152. For example, assuming that Toscany borrowed the entire $16,500,000.00 from Natwest under the Amended Loan Agreement, that Westinghouse paid $3,000,000.00 to Natwest pursuant to the Participation Agreement and that Alco paid $1,000,000.00 to Natwest pursuant to the Guaranty. The $1,000,000.00 paid by Alco would reduce the outstanding amount of the Loans to $15,500,-000.00. Under this example, if Alco were entitled to be repaid for the $1,000,000.00 that it paid to Natwest pursuant to the Guaranty before Westinghouse was entitled to be repaid for the $3,000,000.00 that it paid to Natwest pursuant to the Participation Agreement, Natwest would recover $12,500,000.00, Alco would recover the next $1,000,000.00

and Westinghouse would only recover $2,000,000.00. Moreover, since Westinghouse has no direct contractual relationship or claim against Toscany, Westinghouse would have no means of recovering the remaining $1,000,000.00 that it is owed.

| | |
|---|---|
| $16,500,000 | (total amount of Natwest's Loans to Toscany) |
| − 1,000,000 | (Alco paid this amount pursuant to Guaranty) |
| 15,500,000 | (total sum still due and owing to Natwest for Loans) |
| | |
| $15,500,000 | (total sum still due and owing to Natwest for Loans) |
| −12,500,000 | (repayment of "Natwest's Share of the Loans" as defined in Participation Agreement) |
| − 1,000,000 | (repayment to Alco for payment made pursuant to Guaranty) |
| 2,000,000 | (amount left to repay Westinghouse for Participation) |
| | |
| $1,000,000 | (Westinghouse is still owed this amount for its Participation; however, it has no legal right to recover this amount because Westinghouse has no contractual relationship with Toscany.) |

---

102. However, if Westinghouse is entitled to be repaid the $3,000,000.00 that it paid to Natwest pursuant to the Participation Agreement before Alco is entitled to be repaid the $1,000,000.00 that it paid to Natwest pursuant to the Guaranty, all of the parties have the means to be repaid; Natwest would recover $12,500,000.00, Westinghouse would recover the next $3,000,000.00 and then Alco would have a claim against Toscany for the $1,000,000.00 that it is owed. Moreover, Alco's claim against Toscany would be a secured claim because Alco would step into Natwest's shoes under the Amended Loan Agreement.

| | |
|---|---|
| $16,500,000 | (total amount of Natwest's Loans to Toscany) |
| − 1,000,000 | (Alco paid this amount pursuant to Guaranty) |
| 15,500,000 | (total sum still due and owing to Natwest for Loans) |
| | |
| $15,500,000 | (total sum still due and owing to Natwest for Loans) |
| −12,500,000 | (repayment of "Natwest's Share of the Loans" as defined in Participation Agreement) |
| − 3,000,000 | (repayment of Westinghouse's Participation) |
| 00 | (Toscany's indebtedness and obligations to Natwest under the Amended Loan Agreement have been paid in full). |
| | |
| $1,000,000 | (Alco has a secured claim against Toscany for this amount. Alco steps into the shoes of Natwest because Toscany has only paid $15,500,000 under the Amended Loan Agreement; the other $1,000,000 was paid by Alco.) |

---

*See* T.T. at 148–152.

### CONCLUSIONS OF LAW

103. Jurisdiction for this Fed.R.Civ.P. 22(1) interpleader action is based on 28 U.S.C. § 1332(a).

104. For purposes of diversity jurisdiction, Natwest is a citizen of New York; Alco is a citizen of Ohio and Pennsylvania; and Westinghouse is a citizen of Delaware and Pennsylvania.

105. Venue is based on 28 U.S.C. § 1391(a).

*Contract Interpretation*

■ 106. The primary objective in contract interpretation is to give effect to the intent of the contracting parties " 'as revealed by the language they chose to use.' " *Sayers v. The Rochester Telephone Corporation Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (quoting *Seiden Assocs. v. ANC Holdings,* 959

F.2d 425, 428 (2d Cir.1992)); *see also, Pantone, Inc. v. Esselte Letraset Ltd.,* 691 F.Supp. 768, 771 (S.D.N.Y.1988), *aff'd,* 878 F.2d 601 (2d Cir.1989).

107. The issue of whether a contract is ambiguous is a question of law. *Sayers,* 7 F.3d at 1094. A contract whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. *Id.* at 1095; *see also, Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989).

108. Where the language of a contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court. *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985).

109. When a written contract is clear and unequivocal, its meaning must be determined by its contents alone, without resort to extrinsic evidence. *See John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994); *Hunt Ltd.,* 889 F.2d at 1277; *Stroll v. Epstein,* 818 F.Supp. 640, 643 (S.D.N.Y.1993), *aff'd,* 9 F.3d 1537 (2d Cir.1993). Its meaning is to be determined in accordance with its plainly expressed intent. *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428–29 (2d Cir.1992).

110. A court should not rewrite a contract or create new terms or change the terms made by the parties. *See Broadway National Bank v. Progressive Casualty Insurance Company,* 775 F.Supp. 123, 126 (S.D.N.Y.1991), *aff'd,* 963 F.2d 1522 (2d Cir. 1992).

111. "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Sayers,* 7 F.3d at 1095 (citations omitted).

112. When the terms of a contract are ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent. *Christiania General Insurance Corp. v. Great American Insurance Company,* 979 F.2d 268, 274 (2d Cir.1992); *U.S. Naval Institute v. Charter Communications,* 875 F.2d 1044, 1048 (2d Cir.1989).

113. Usage of trade or industry custom is only relevant in interpreting a contract where the usage is known, or reasonably should be known, to all sides of a transaction. *Flower City Painting Contractors v. Gumina Const. Co.,* 591 F.2d 162, 165 (2d Cir.1979).

114. Furthermore, an interpretation that gives a reasonable and effective meaning to all of a contract's terms is preferred to one that leaves a part unreasonable or of no effect. *See Rothenberg,* 755 F.2d at 1019; *U.S. Naval Institute,* 875 F.2d at 1049.

115. A contract must be construed, if possible, to avoid an interpretation that will result in an absurdity, an injustice or have an inequitable or unusual result. *See Silinsky v. State–Wide Insurance Company,* 30 A.D.2d 1, 289 N.Y.S.2d 541, 549 (N.Y.App. Div.1968).

116. The most reasonable interpretation of the contracts in this case, consistent with the language of those agreements and the above principles of interpretation, is that repayment of Westinghouse's Participation has priority over repayment of Alco's Guaranty.

*Assignment of Contracts*

117. Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke. *See Miller v. Wells Fargo Bank International Corp.,* 540 F.2d 548 (2d Cir.1976); *Banque Arabe International D'Investissement,* 726 F.Supp. 1411, 1417 (S.D.N.Y.1989).

118. Natwest never relinquished any of its interest, authority or control that it derived from the Guaranty to Westinghouse. Westinghouse never possessed the right to

demand Alco to make payment under the Guaranty or to compel Alco to pay $1,000,-000.00 to Westinghouse under the Guaranty.

119. The Guaranty was not assigned to Westinghouse.

*Equitable Subrogation*

■ 120. Under the doctrine of equitable subrogation, a guarantor has the right to be subrogated to any and all rights that a creditor or subrogor has against a debtor. *See Thornton v. Syracuse Savings Bank*, 961 F.2d 1042, 1046–47 (2d Cir.1992); 63 N.Y.Jur.2d *Guaranty and Suretyship* § 428, at 566 (1987).

■ 121. While the principals of equitable subrogation provide a guarantor, such as Alco, with the right to be subrogated to any and all rights that a creditor or subrogor, such as Natwest, has against the debtor, the remedy of equitable subrogation arises only when the debt to the creditor or subrogor has been paid in full. *See Thornton*, 961 F.2d at 1047 (subrogation may only be utilized after full payment of the debt owed the subrogor); *Van Schaick v. Lawyers' Title & Guaranty Co.*, 149 Misc. 498, 150 Misc. 174, 268 N.Y.S. 554, 563 (1933) (right of subrogation does not arise until the guaranteed indebtedness has been paid in its entirety), *aff'd sub nom. Van Schaick*, 241 A.D. 808, 271 N.Y.S. 950 (1934), *aff'd sub nom. In re Van Schaick*, 266 N.Y. 402, 195 N.E. 126 (1934).

■ 122. Under the doctrine of equitable subrogation, where a guarantor has only paid a portion of the debt owed to the creditor, the guarantor is not entitled to be subrogated to the rights of the creditor. *See In re Robert F. Ryan, Ltd.*, 51 Misc.2d 565, 566, 273 N.Y.S.2d 507, 508 (1966) (guarantor who paid partial amount of debt owed to creditor is not entitled to be subrogated to rights and remedies of creditor until the debt to the creditor is paid in full).

■ 123. Paragraph 7 of the Guaranty is consistent with the doctrine of equitable subrogation. Pursuant to paragraph 7 of the Guaranty, as amended, Alco is not entitled to be subrogated to the rights of Natwest under the Amended Loan Agreement until Tosca-ny's indebtedness to Natwest under the Amended Loan Agreement has been repaid in full.

124. Toscany's indebtedness and obligations to Natwest under the Amended Loan Agreement have not been paid in full. Since Toscany's indebtedness and obligations to Natwest under the Amended Loan Agreement and Note have not been paid in full, the "Guaranteed Obligations" as defined in the Guaranty, as amended by the Letter Amendment, have not been repaid in full.

125. Alco is not currently entitled to be subrogated to the rights of Natwest under the Amended Loan Agreement. Alco is not entitled to be repaid for the $1,000,000.00 that it paid to Natwest pursuant to the Guaranty, as amended, before Westinghouse is repaid for the $3,000,000.00 that it paid to Natwest pursuant to the Participation Agreement.

126. If the contractual agreements at issue were interpreted to allow Alco to be immediately subrogated to the rights of Natwest under the Amended Loan Agreement after Natwest has been paid in full for Natwest's Share of the Loans and before Westinghouse is paid by Natwest for the Participation, Westinghouse would have no legal right to recover for the full amount of its Participation since Westinghouse has no direct claim against Toscany for the amount of its Participation.

127. However, if the contractual agreements at issue are interpreted to allow Alco to be subrogated to the rights of Natwest only after Westinghouse has been repaid in full by Natwest for the amount of the Participation, Alco would have a legal right to recover the amount that it paid under the Guaranty because Alco has a direct claim against Toscany for such amount.

128. The interpretation of the contractual agreements at issue that Alco's right to be subrogated to the rights of Natwest under the Amended Loan Agreement does not arise until Westinghouse has been repaid by Natwest for its Participation is consistent with the language of the agreements.

129. The interpretation urged by Alco would require the Court to rewrite the lan-

guage of the Amended Loan Agreement, Guaranty and Participation Agreement.

130. For the above stated reasons, judgment shall be entered for interpleader defendant Westinghouse, and the complaint dismissed with prejudice. Westinghouse is entitled to receive the entire amount of the Interpleader Funds with the interest accrued thereon.

SO ORDERED.