FLEXI–VAN LEASING, INC., Plaintiff,

v.

Estefano ISAIAS, Defendant.

No. 96 Civ. 5183 (BN).

United States District Court,
S.D. New York.

Oct. 14, 1998.

Flicker, Garelick & Associates, New York City, Keith L. Flicker, Kenneth Simon, for Plaintiff.

Freehil, Hogan & Mahar, New York City, Wayne D. Meehan, Don P. Murnane, for Defendant.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge.[1]

Plaintiff, Flexi–Van Leasing, Inc. ("Flexi–Van"), is suing to recover $156,684.76 plus interest, attorney's fees and costs from defendant, Estefano Isaias ("Isaias"), based upon a personal guaranty signed by him on April 15, 1997.

The court has jurisdiction in this case pursuant to 28 U.S.C. Section 1332, and venue properly lies in this district under 28 U.S.C. Section 1391. The case was tried before this court in a two-day bench trial. In conformity with Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the court's findings of fact and conclusions of law.

### THE RECORD

The parties presented the testimony of four witnesses: Bernard Vaughn, Estefano Isaias, Evelio Quirch, and Vasili Krishnamurti, an expert. By agreement, both parties were allowed to elicit direct testimony from any of the four witnesses, and all of the witnesses testified as part of both the plaintiff's and defendant's case. The parties also stipulated into evidence twenty-seven exhibits, including the transcript of a deposition of Armando Espinel.

### FINDINGS OF FACT

Flexi–Van is a lessor of marine chassis equipment, which consists of a wheeled undercarriage attached to a tractor, for the purpose of transporting ocean-going containers over roadways. Prior to April 1987, Flexi–Van also leased ocean-going containers to shipping lines for the transport of cargo aboard ships. Defendant, Estefano Isaias ("Isaias") was an owner, investor, and board member of Naviera Continental, the company that operated a small shipping fleet. In 1983, Naviera Continental changed its place of incorporation and its name to Naviera Consolidada, S.A. Navicon U.S.A. was the local agent owned and controlled by Naviera Consolidada. (These entities are hereinafter referred to as "Naviera").

Naviera was a client of Flexi–Van's for approximately two decades. In the late 1970's, Flexi–Van considered Naviera to be a credit risk. Because of Flexi–Van's concerns, Roberto Isaias, the defendant's brother who also had an ownership interest in Naviera, signed a personal guaranty on April 17, 1979. The guaranty was drafted by employees of Flexi–Van and covered "lease agreements" entered into by the companies for both containers and chassis, and was to "remain and continue in full force and effect upon any renewal, modification or extension of any of the leases." The 1979 guaranty does not refer to any specific leases nor were there any specific lease agreements attached to the guaranty.

In 1983, Naviera Continental, S.A., changed its name to Naviera Consolidada, S.A., and its place of incorporation from Ecuador to Panama. The relationship between the companies remained the same; but as a result of the changes, Flexi–Van required a second personal guaranty with the proper name of the company. All existing leases for equipment were also transferred to the new shipping line.

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as     United States District Judge by designation.

At this point, Flexi–Van believed that the defendant, Estefano Isaias, was controlling Naviera. Thus, his signature was requested on the substitute guaranty. However, the guaranty that Flexi–Van eventually secured in 1984 was signed by Arturo Abascal ("Abascal"), operating under a Power of Attorney in the name of Estefano Isaias. Flexi–Van had again drafted the guaranty which also covered "leases" and "lease agreements" for containers and chassis. The 1984 guaranty further provided that it "shall remain and continue in full force and effect upon any renewal, modification or extension of any of the leases." The 1984 guaranty similarly did not refer to any specific leases and no lease agreements were attached to it.

Two years later, in 1986, Flexi–Van determined that the Power of Attorney did not actually authorize Abascal to sign Estefano's name in a personal capacity, thus rendering the 1984 guaranty invalid. Therefore, Flexi–Van required a third guaranty from Isaias. At that time, Naviera's debt to Flexi–Van exceeded $142,300, causing Flexi–Van to place the Naviera account in default. However, the business relationship continued, as illustrated by a lease for 100 containers in October, 1986.

The third personal guaranty (the second substitute guaranty and the one at issue in this case) was signed by Estefano Isaias on April 15, 1987. The delay was caused by the fact that Isaias was unavailable and the document, drafted by Flexi–Van, was being reviewed by different attorneys at Naviera. During the period leading up to the execution of the 1987 guaranty, Naviera's preexisting debt of over $142,300 was paid.

Like the two previous guaranties, the 1987 document did not refer to any specific leases and did not have any attachments. The guaranty stated in pertinent part:

> For value received and in consideration for and as an inducement to Flexi–Van Leasing, Inc., ... in making lease agreements ("the Lease" or "Leases") with [Naviera] ... (the "Lessees") ... the undersigned, ... hereby guarantees to you [Flexi–Van], ... the due regular and punctual payment of the total rental as provided in the Leases, ... and further guarantees that the Lessees will faithfully perform and fulfill all agreements and obligations provided in

the Leases at the time and in the manner therein provided. The undersigned agrees to pay on demand all losses, costs, reasonable attorney's fees, or expenses which may be suffered by you by reason of Lessees' default ... The extension of the time of payment or the renewal of the Leases or the extension of the time of performance of agreements or any other indulgence may be granted to the Lessees ... without notice to the undersigned, and all settlements, compromises, accounts stated and agreed balances made in good faith between the Lessees ... and you shall be binding upon and shall not affect the liability of the undersigned.

Defendant testified that he did not read the guaranty carefully at the time that he signed it. However, he believed that the agreement was intended to cover a lease that was executed between Naviera and Flexi–Van at about the same time. The court finds this testimony to be credible. Defendant believably testified that due to his many and diverse business activities, he often relies on the advice of employees and attorneys. At the time he signed the agreement, Isaias believed that it was intended to guaranty a lease that was executed between Naviera and Flexi–Van at approximately the same time.

One week earlier, on April 8, 1987, the companies had entered into a term lease, Lease No. T–005690. This lease covered 25 chassis, at the rate of $3.00 per day for 20' and 40' standard chassis and $4.00 per day for 40'8 twist lock chassis, for a duration of 24 months. On May 1, 1987, at the request of Naviera, but without the consent of Isaias, this lease was modified to include an additional 3 chassis. Again, on September 14, 1990, at Naviera's request, but without the consent of Isaias, the amended lease was transferred into a new lease agreement, Lease No. T–006115. This new agreement was on a different contract form and provided for a reduced rental rate of $2.75 per day, but changed the duration of the lease to 36 months.

The companies entered into seven additional lease agreements between 1990 and 1992. On June 25, 1993, at Naviera's request, but without Isaias' consent, a master

lease was created to consolidate six of the eight leases, Lease No. CM–930501. This new lease covered approximately 84 chassis for the rental rate of $2.75 a day for 12 months. Thus, in 1993 there was a total of three leases (including the master lease) which covered over 100 chassis. The other two leases, Lease No. T–006160, which covered 10 chassis and Lease No. T–006200, which pertained to 3 chassis, provided for the rental rate of $2.75 per day for 36 months. The 3 leases also contain additional terms, conditions and liquidated damages provisions, which were not included in Lease No. T–005690 (the lease executed contemporaneously with the 1987 guaranty).

In 1995, Naviera began to have financial difficulties and ceased operations after one of its ships sank. Flexi–Van subsequently recovered 96 out of 100 of the leased chassis through its own efforts and expense. Therefore, Flexi–Van then demanded payment of $143,975.30 from Isaias pursuant to the 1987 personal guaranty, for charges incurred under the three outstanding leases: Nos. T–006160, T–006200, and CM–93051. However, there was no specific demand for payment under Lease No. T–005690. When payment was not tendered, this suit was commenced. The damage figure has been stipulated to be $156,684.76 and relates to 92 chassis leased by Naviera.

At trial, Flexi–Van's expert witness, Vasili Krishnamurti ("Krishnamurti"), testified that it is customary in the chassis leasing industry to obtain a guaranty for all leases and not one specific transaction. Krishnamurti explained that this is due to the impracticability of obtaining a guaranty for each transaction. He also testified that it is common to transfer equipment from one lease to another. The fundamental obligations of the shipping line remain the same if it still possesses the leased equipment, even if, for example, the rates are changed.

The court is not persuaded by Krishnamurti's testimony. His sole experience with securing a guaranty is based upon a transaction involving a corporate guaranty, not a personal guaranty. More importantly, although he stated that the custom in the industry was to secure a guaranty to encompass all leases, the one guaranty that Krishnamurti had required in his own business specifically stated that it covered a particular lease as well as all modifications of that agreement.

In addition, Krishnamurti did not offer any convincing evidence that specific terms used in the chassis-leasing or shipping industry carry special meaning for purposes of interpreting the language of contractual agreements.

### Contentions of the Parties

Flexi–Van contends that the personal guaranty signed on April 15, 1987, was a continuing guaranty, and therefore, covers all subsequent leases entered into by the parties. Isaias, argues that the 1987 guaranty relates only to Lease No. T–005690, which is the lease executed within several days of the guaranty and covering the rental of 25 chassis. Isaias further insists that he was released of his obligations for Lease No. T–005690 when it was altered without his consent.

### Conclusions of Law [2]

■ A court's task is to determine the intentions of the parties based upon the executed guaranty in light of custom and practice in the industry. *See Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 412–413 (S.D.N.Y.1994); *USI Capital and Leasing v. Chertock,* 172 A.D.2d 235, 568 N.Y.S.2d 74, 75 (1st Dept.1991); *Brewster Transit Mix Corp. v. McLean,* 169 A.D.2d 1036, 565 N.Y.S.2d 316, 317 (3d Dept.1991); *Edison v. Viva International, Ltd.,* 70 A.D.2d 379, 421 N.Y.S.2d 203, 205 (1st Dept. 1979). In considering the extent of the created obligations, it is a well-established principle that the terms of a guaranty are to be strictly construed in favor of the guarantor, *see Kleet Lumber Co. v. Quail Homes of Long Island, Inc.,* 129 A.D.2d 564, 514 N.Y.S.2d 60, 60 (2d Dept.1987); *Dunkirk Trust Co. v. Schmitt,* 316 F.2d 537, 539 (2d Cir.1963); and that a guarantor cannot be

---

**2.** Any conclusion contained within this section that constitutes a factual determination should be deemed a finding of fact.

bound beyond the express terms of a guaranty. *See also Wesselman v. Engel Co.*, 309 N.Y. 27, 127 N.E.2d 736, 738 (1955); *Central Trust Co. v. J. Gottermeier Development Co.*, 65 Misc.2d 676, 319 N.Y.S.2d 25, 27 (N.Y.Sup. Ct.1971). Furthermore, unless the plain meaning of a guaranty "clearly import[s] a continuing liability, it will be limited to the transaction for which it was given." *Dunkirk Trust Co. v. Schmitt*, 316 F.2d 537, 539 (2d Cir.1963), *quoting, Trimline Window Frame, Inc. v. Rural New Yorker, Inc.*, 8 Misc.2d 645, 168 N.Y.S.2d 170, 173 (Sup.Ct. Nassau County 1957). Thus, the initial question is whether the express language of the guaranty indicates that it was intended to apply to pre-existing debts, a particular transaction, or all of Naviera's debts continuing into the future.

First, the guaranty does not clearly state that it is intended to cover all future debts. Rather, the guaranty was given "[f]or value received and in consideration for and as an inducement to Flexi–Van ... in making lease agreements (the 'Lease' or 'Leases') ... without in any way binding [Flexi–Van] to enter into the leases." This language does not clearly impose a burden upon Isaias to guaranty future debts of Naviera. Indeed, the language may simply mean that the guaranty was offered to cover current debts as an inducement to Flexi–Van to enter into future leases with Naviera. Also contrary to plaintiff's interpretation of the guaranty, other decisions construing a guaranty to encompass future debts under New York law have considered language that expressly covered future obligations. *See e.g., Chemical Bank*, 60 N.Y.2d 289, 469 N.Y.S.2d 609, 610, 457 N.E.2d 714 (instruments explicitly stated that they were "continuing" guaranties of "all liabilities ... whether now existing or hereinafter incurred"); *USI Capital and Leasing*, 568 N.Y.S.2d at 75, (guaranty stated it was an "absolute, unconditional, continuing guaranty of payment ... of all indebtedness and obligations ... of every kind and description ... whether now or hereafter arising"). Hence, the guaranty in the present case does not contain the same clear terms that are commonly understood to create continuing liability.

In addition, other language used in the guaranty indicates that it was not intended to cover all future obligations. The guaranty states:

> "[t]he extension of the time of payment or the renewal of the Leases or the extension of the time of performance of agreements or any other indulgence may be granted to the Lessees ... without notice to the undersigned [Isaias], and all settlements, compromises, accounts stated and agreed balances made in good faith between the Lessees ... and you [Flexi–Van] shall be binding upon and shall not affect the liability of the undersigned [Isaias]."

If the guaranty was intended to cover all future debts, this clause would be meaningless.

■■■ Under New York law, liability created by a guaranty covering previously-existing debt or a particular transaction is extinguished if the time of payment is extended or the underlying agreement is altered in any way. *Becker v. Faber*, 280 N.Y. 146, 19 N.E.2d 997, 998–1000 (1939). A guaranty remains intact despite a change in the underlying agreement only when the debtor is given some "indulgence" which remits part of the obligation without changing the amount or date due. *Id.*

■■■ A continuing guaranty, on the other hand, does not relate to one specific loan, but encompasses the payment of all debts, including those that will occur in the future. *See Trustco Bank New York v. Sage*, 238 A.D.2d 839, 656 N.Y.S.2d 542, 543 (3d Dept. 1997). Consequently, such a guaranty is not limited to contemporaneously executed or pre-existing loans and remains enforceable despite changes in the underlying agreement and continues even after the original debt has been repaid. *See USI Capital and Leasing*, 568 N.Y.S.2d at 75.

However, according to the express language of the document, Mr. Isaias guaranteed the debts for which the guaranty was given even if the time of payment was extended, or the leases were renewed, or the time to perform was extended, or any other "indulgence" was given to Naviera without notice to Isaias. However, if the guaranty was continuing and covered all future leases, these specific provisions would have been

pointless because the guarantor's obligation under a continuing guaranty is unaffected by any of the alterations which Flexi–Van chose to list when it drafted the guaranty. *See Dunkirk,* 316 F.2d at 539 (stating that it would be unnecessary for "specific reference to 'renewals' if all future notes were intended to come within the instrument's coverage"), *see also Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985) (contract terms should not be interpreted in a manner that renders part of the contract unreasonable or of no effect); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961) (terms of contract should be construed so that every term has meaning). Thus, like the guaranty considered in *Dunkirk,* the guaranty signed by Isaias does not use language that clearly expresses an intent to cover all future obligations and uses other specific references which would only be necessary if the guaranty were intended to cover a particular transaction or previously-incurred debt.

Flexi–Van has tried to refute this interpretation by offering expert testimony about the custom and usage of guaranties in the shipping industry. However, as mentioned earlier, the court finds plaintiff's expert to be unpersuasive. Despite his decades of experience in the shipping industry, and his testimony that it was commonplace to require a personal guaranty for all past and future obligations for a troubled account, plaintiff's expert had, in only one prior instance, required a guaranty from a client. That guaranty, unlike the one at issue here, pertained to a specified lease and explicitly encompassed modifications to the underlying agreement.

▌Given that the guaranty was not meant to cover all future debts, the court must determine which transaction the guaranty was intended to cover. However, the guaranty does not indicate the transaction for which it was given. That document merely states that it is given "[f]or value received and in consideration for and as an inducement to Flexi–Van ... in making lease agreements." While the phrase "value received" indicates that the guaranty pertains to past debts, the words "in consideration for and as an inducement to" do not indicate which transaction is guaranteed. When the

express terms of a contract are so ambiguous that they fail to convey the parties' intentions, a court may consider extrinsic evidence to interpret the intentions of the parties. *See Kleet Lumber Co.,* 514 N.Y.S.2d at 60. Ambiguous terms are those "capable of more than one meaning" when viewed by a reasonably intelligent person who is aware of the trade usage and has viewed the agreement in its entirety. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996).

In this regard, the court finds defendant's testimony to be most helpful. Mr. Isaias testified that he was not certain as to the precise scope of the guaranty, but he believed the guaranty was for a lease that was executed at approximately the same time. Lease No. T–005690 was signed seven days earlier on April 8, 1987. After having an opportunity to observe the witness and hear his testimony, the court accepts his explanation. In this regard, defendant's interpretation of the guaranty becomes more questionable. Defendant points to nothing more than it's interpretation of custom and the language of the guaranty to argue that future leases were covered. Their contentions have already been rejected by the court.

Furthermore, there is no persuasive evidence to establish that guaranties in the chassis industry cover past, present, and future obligations. Therefore, the personal guaranty of 1987 was not a continuing guaranty and only covered the lease that was executed contemporaneously therewith, Lease No. T–005690 (covering 25 chassis).

▌The third issue is whether the defendant, Isaias, has been released of his obligation under Lease No. T–005690 (the 25 chassis). The Court concludes that Isaias has been released. Under New York law, the guarantor must consent to any alterations of a contractual obligation. *See Bier Pension Plan Trust v. Estate of Schneierson,* 74 N.Y.2d 312, 546 N.Y.S.2d 824, 826, 545 N.E.2d 1212 (1989); *Becker,* 280 N.Y. at 148, 19 N.E.2d at 998–999 (1939). If any alterations are made without the guarantor's consent, he is released from all obligations, including the original one. *See Becker,* 280 N.Y. at 148–150, 19 N.E.2d at 998–999. For

example, a guarantor will be discharged when the time for payment of the principle sum has been extended, even if it is for a few days. *See id.* at 151, 19 N.E.2d at 999–1000.

■ However, a guarantor is not discharged if an alteration is merely an "indulgence" towards the principal. Such leniency occurs by way of a remission of a part of an obligation or waiver of full performance. *See id.* at 150, 19 N.E.2d at 999. For example, when the rate of interest or amount of rent under a guaranteed lease is reduced or when a part of the performance of a contract is waived, but the obligation is not legally altered so that only the lesser demand would be enforceable, then a mere indulgence has been given. *See id.* at 150–152, 19 N.E.2d 997, 19 N.E.2d at 999–1000.

The facts indicate that Lease No. T–005690 was extended to include 3 more chassis (May 1, 1987). On September 14, 1990, it was transferred to a different lease (No. T–006115) and on June 25, 1993, this substituted lease was transferred again to the master lease (Lease No. CM–930501). Flexi–Van received the consent of Naviera, for both the extension and transfers, but it did not receive the consent of the guarantor, defendant.

■ Although daily rental charges were reduced, the time of payment of the principle sum was lengthened, liquidated damages provisions were included in the transfer leases, and the number of chassis was increased to 28. Notably, the guaranties signed by defendant in 1984, and his brother in 1979, expressly stated that they "shall remain and continue in full force and effect upon any renewal, modification or extension of the leases." However, Flexi–Van removed the language regarding modifications from the 1987 guaranty. As a result, established New York law dictates that these alterations released Mr. Isaias from his original obligation under Lease No. 005690 (25 chassis).

In conclusion, the Court holds that the express terms of the 1987 guaranty prevent it from being a continuing guaranty. Therefore, its coverage is limited to the obligation incurred at the same time the guaranty was executed, Lease No. T–005690. Because the terms were not ambiguous in light of the Second Circuit's decision in *Dunkirk,* and because there was no acceptable basis to determine trade usage, extrinsic evidence should not be admitted.

Finally, and significantly, because Lease No. T–005690 was altered without the consent of the guarantor, Isaias, he is released under the original obligation, which was for payment of the daily rental of 25 chassis.

### Conclusion

Flexi–Van's claim is denied. The 1987 guaranty was not a continuing guaranty and Isaias' obligations were extinguished when Lease T–005690 was modified.

The Clerk of the Court is directed to enter judgment in favor of defendants with costs accordingly.

**IT IS SO ORDERED.**