FIRST STATE BANK, a Wisconsin Corporation, Plaintiff,
and
Lemont Shipbuilding and Repair Company, Intervening-Plaintiff,
and
National Marine Service, Inc., a Delaware Corporation, Intervening-Plaintiff,

v.

TOWBOAT CHIPPEWA, her engines, boilers, machinery, tackle, apparel, furniture and equipment, Defendant.

No. 74 C 2718.

United States District Court, N. D. Illinois, E. D.

Aug. 22, 1975.

Elmer Michael Walsh, Jr., Chicago, Ill., for First State Bank.

Gould & Ratner, Chicago, Ill., for Lemont Shipbuilding and Repair Co.

McBride, Baker, Wienke & Schlosser, Chicago, Ill., for National Marine Service.

Bobby Russell, pro se.

Paul McCambridge, Chicago, Ill., for Intermarine Associates, Inc., Michael Pehler and Elmer Gotz.

Dominic Troiani, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., and Robert D. Barnes of McBride, Baker, Wienke & Schlosser, Oak Brook, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

This is an action brought against a motor-powered towboat, Chippewa, and its owner, Intermarine Associates, Inc. (Inter Marine) by the First State Bank of Fountain City, Wisconsin (First State Bank), and various intervening plaintiffs. The controversy centers around the order in which plaintiffs should be allowed to recover their claims against the boat from the proceeds derived from a court-ordered November 21, 1974 sale of the boat.

The Chippewa was seized by a Deputy U. S. Marshal on October 3, 1974, pursuant to this *in rem* action filed on September 20, 1974 by First State Bank to foreclose its mortgage on the boat. The First State Bank, as well as National Marine Service (NMS), an intervening plaintiff, have filed cross motions for summary judgment. The relevant undisputed facts are as follows:

1) Inter Marine, incorporated under the laws of Minnesota, made a down

payment on or about March 6, 1973 in the amount of $30,000 to Peter Seradino of A&O Barge Line toward the purchase price ($95,000) of the "Elizabeth Evans", later changed to "Chippewa".

2) Partially in order to pay the balance of the purchase price, Inter Marine received a loan during March, 1973 of $130,000 from the First State Bank.

3) Because the Wisconsin Banking laws placed a ceiling of 20 per cent of capital stock and surplus upon bank loans to corporations, the First State Bank could lend only $50,000 of the $130,000 requested by Inter Marine. It received the remaining $80,000 from American Bank of Alma, Wisconsin (American Bank) through a participation agreement.

4) Inter Marine executed and delivered to First State Bank on April 16, 1973 a mortgage of the towboat on the appropriate Department of Transportation, U. S. Coast Guard form, as security for repayment of the principal and interest evidenced by the Installment Note of April 16, 1973.

5) On the same date, the Coast Guard documentation officer issued Permanent Certificate 37–A enrolling the vessel at the Port of Memphis and transferred ownership in the towboat to Inter Marine.

6) First State Bank advanced the $130,000 to Inter Marine on the following three dates and in the following amounts:

a) First Advance, April 16, 1973, $10,000

b) Second Advance, May 1, 1973, $65,000

c) Third Advance, May 18, 1973, $55,000

7) On May 1, 1973, Inter Marine delivered a note dated May 1, 1973 to First State Bank in the amount of $65,000 with an interest rate of 8½ per cent and a maturity date of October 16, 1973. First State assigned to American Bank an undivided interest or participation of $25,000 in this loan, which

was secured by the April 16, 1973 mortgage.

8) On May 7, 1973, the mortgage on the vessel "Elizabeth Evans", made by Inter Marine to First State Bank on April 16, 1973, was recorded in the records of the U. S. Coast Guard at the Port of Memphis, Tennessee, and the following was typed on the back side of Permanent Certificate No. 37–A of the Vessel ELIZABETH EVANS:

1. The names of the mortgagor, Inter Marine, and mortgagee, First State Bank.

2. The time and date of endorsement.

3. The amount and date of maturity of the mortgage.

4. The discharge amount.

9) On May 21, 1973, First State Bank assigned to American Bank an undivided interest or participation of $80,000 in the loan of $130,000 made by First State Bank to Inter Marine on April 16, 1973 and having a maturity date of April 16, 1978.

10) On the basis of the participation, American Bank issued a credit to First Bank on which its loan to Inter Marine was based.

11) On September 14, 1973, the U. S. Coast Guard at the Port of Memphis, Tennessee, issued a marine document, designated Consolidated Certificate of Enrollment and License No. 24, entitling the towboat to engage in the Coasting Trade.

12) The name of American Bank was never endorsed by the United States Coast Guard on Consolidated Certificate No. 37–A of the towboat as a mortgagee or joint mortgagee of the vessel.

13) The name of American Bank was never endorsed by the United States Coast Guard on Consolidated Certificate No. 24 of the vessel as a mortgagee or joint mortgagee.

14) The interest acquired in the vessel by American Bank was never endorsed by the United States Coast Guard on the mortgage or on Consolidated Cer-

tificate No. 24 of the vessel and never recorded by the Coast Guard in its official records.

15) A Declaration of Vendee, Transferee, or Mortgagee specified in section 40 of the Shipping Act, 1960, 46 U.S.C. § 838, 46 C.F.R. 67.47–1, was never filed by the American Bank with the United States Coast Guard at the Port of Memphis, Tennessee in connection with the making, delivery, or recording of the mortgage or in connection with the execution and delivery of the Participation Certificate dated May 21, 1974 by First State Bank to the American Bank.

16) During the months of December 1973 and January 1974, the Chippewa underwent repairs at the National Marine Service shipyard at Hartford, Illinois. NMS has filed a claim against the vessel for repairs totaling $89,687.66.

17) On April 21, 1974, Inter Marine made a principal and interest payment to First Bank, but no payments have been received since that date. Inter Marine presently owes First State Bank $110,095.95, plus interest of $9,358.16, plus a daily interest of $25.64 accruing after April 21, 1975.

18) During May 1974, the Chippewa entered the Lemont Shipbuilding and Repair Company (Lemont) shipyard at Lemont, Illinois, for repairs.

19) The Lemont Vice President was advised of the existence of the First State Bank mortgage on the vessel before the first repairs were started and he did not ask to see the vessel's license or the mortgage.

20) Lemont has filed a claim against the vessel totaling $29,028.69 for repairs and storage.

21) Lemont's Vice President in charge of repairs testified that the towboat was damaged when it arrived at the yard, but it arrived under its own power and was not in danger of foundering, unless a malfunction developed in the vessel's pumps. The pumps did not falter.

22) Lemont employees made permanent repairs and performed customary services when the vessel was placed in dry dock; Inter Marine was billed for all services performed.

The First State Bank has moved for summary judgment contending that no issues of material fact exist and that it meets the preferred mortgage requirements of the Ship Mortgage Act of 1920 and is, therefore, entitled to priority in its claim against the ship's proceeds. This motion is opposed by NMS on the grounds that American Bank is a mortgagee within the meaning of the Ship Mortgage Act of 1920 and, because it failed to comply with the recording, endorsement, and citizenship declaration requirements of the Ship Mortgage Act of 1920, the mortgage in question is not a preferred mortgage. NMS, accordingly, moves for summary judgment.

Inter Marine oppposes NMS' motion and supports First State Bank's motion contending that the American Bank is not a mortgagee inasmuch as it has no means under the participation agreement to enforce payment of the $130,000, nor does it have standing to foreclose the mortgage. Inter Marine argues that no reason exists in law or policy to require that participants in vessel mortgages be identified as a matter of record in any manner different from non-maritime loan transactions, where loan participants are customarily not identified. Finally, it urges that the purposes of the Ship Mortgage Act will best be served by upholding the preferred status of the First State Bank mortgage.

The primary issue to be resolved in this motion is whether the mortgage given by Inter Marine to First Bank is a preferred mortgage under the Ship Mortgage Act of 1920, 46 U.S.C. § 911 et seq., or a common-law non-maritime contract.

Title 46, United States Code, section 922 provides:

§ 922. Preferred mortgages

(a) A valid mortgage which at the time it is made, includes the whole of any vessel of the United States (other

than a towboat, barge, scow, lighter, car float, canal boat or tank vessel, of less than twenty-five gross tons), shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if—

(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

(2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;

(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;

(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and

(5) The mortgagee is a citizen of the United States and for the purposes of this section the Reconstruction Finance Corporation shall, in addition to those designated in section 888 and 802 of this title, be deemed a citizen of the United States.

(b) Any mortgage which complies in respect to any vessel with the conditions enumerated in this section is hereafter in this chapter called a "preferred mortage" as to such vessel.

(c) There shall be endorsed upon the documents of a vessel covered by a preferred mortgage—

(1) The names of the mortgagor and mortgagee;

(2) The time and date the indorsement is made;

(3) The amount and date of maturity of the mortgage; and

(4) Any amount required to be indorsed by the provisions of subsection (e) or (f) of this section.

(d) Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, . . . ; and no clearance shall be issued to the vessel until such endorsement is made. . . . Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

(e) A mortgage which includes property other than a vessel shall not be held a preferred mortgage . . . . .

(f) If a preferred mortgage includes more than one vessel . . . . .

Section 921 provides:

§ 921. Sale, conveyance, or mortgage of vessel of United States; record

(a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subsection (b) of this section.

(b) Such collector of customs shall record bills of sale, conveyances, and mortgages delivered to him, in the order of their reception, in books to be kept for that purpose and indexed to show—

(1) The name of the vessel;

(2) The names of the parties to the sale, conveyance, or mortgage;

(3) The time and date of reception of the instrument;

(4) The interest in the vessel so sold, conveyed, or mortgaged; and

(5) The amount and date of maturity of the mortgage.

Section 953 provides:

§ 953. Preferred maritime lien; priorities, other liens.

(a) When used hereinafter in this chapter, the term "preferred maritime lien" means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court.

Section 961 addresses the effect of a court ordered sale upon the preferred mortgage:

(c) Upon the sale of any vessel of the United States covered by a preferred mortgage, by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a maritime lien other than a preferred maritime lien, the vessel shall be sold free from all preexisting claims thereon; but the court shall, upon the request of the mortgagee, the libellant, or any intervenor, require the purchaser at such sale to give and the mortgagor to accept a new mortgage of the vessel for the balance of the term of the original mortgage. The conditions of such new mortgage shall be the same, so far as practicable, as those of the original mortgage and shall be subject to the approval of the court. If such new mortgage is given, the mortgagee shall not be paid from the proceeds of the sale and the amount payable as the purchase price shall be held diminished in the amount of the new mortgage indebtedness.

Section 951 provides for the enforcement of a preferred mortgage by the mortgagee by a suit in rem in admiralty and for the original and exclusive jurisdiction of the United States District Courts in such suits.

With respect to the declaration of citizenship requirement, section 838 provides:

Whenever any bill of sale, mortgage, hypothecation, or conveyance of any vessel, or part thereof, or interest therein, is presented to any collector of the customs to be recorded, the vendee, mortgagee, or transferee shall file therewith a written declaration in such form as the Secretary of Commerce may by regulation prescribe, setting forth the facts relating to his citizenship, and such other facts as the Secretary requires, showing that the transaction does not involve a violation of any of the provisions of section 808 or 835 [Provisions relating to restrictions on foreign transfers] of this title. Unless the Secretary before such presentation, has failed to prescribe such form, no such bill of sale, mortgage, hypothecation, or conveyance shall be valid against any person whatsoever until such declaration has been filed. Any declaration filed by or in behalf of a corporation shall be signed by the president, secretary,

or treasurer thereof, or any other official thereof duly authorized by such corporation to execute any such declaration.

\*   \*   \*   \*   \*   \*

It is undisputed that American Bank did not comply with the provisions of sections 922 and 838. It is equally undisputed that First State Bank complied with each of the aforementioned provisions.

The purposes of the Shipping and Ship Mortgage Acts were aptly explained by the Fourth Circuit in *Chemical Bank New York Trust Company v. Steamship Westhampton*, 358 F.2d 574 (4th Cir. 1966):

. . . The Shipping Act of 1916 was thus enacted to preserve what merchant marine we did have.

In the year following the passage of this Act German submarines began to decimate allied shipping. Foreign capital made systematic attempts to replenish their losses by gaining control of American vessels. (footnote omitted) To thwart such raiding activities Congress added section 3745 to the Shipping Act, . . . 46 U.S. C.A. § 835 (1958). This section enlarged on paragraph 3 of section 9 by providing that it shall be unlawful during a war or national emergency to do the following without first obtaining the approval of the Secretary of Commerce:

"(b) To sell, mortgage, lease, charter, deliver, or in any manner transfer \* \* \* to any person not a citizen of the United States, (1) any such vessel or any interest therein \* \* \*."

"Mortgages" were added to the list of restrictions because they had "proved to be a common device by which foreign capital has sought to obtain control of American vessels." . . . Then in 1920 section 9 of the Shipping Act was amended to extend the added restrictions of section 37 to peacetime transfers of interests in

ships documented under the laws of the United States. . . . The Shipping Act, as amended, thus had a positive end and a negative means—it was hoped that our merchant marine might be built up and preserved by preventing its slipping into foreign hands.

At the close of the First World War a new situation arose which gave rise to pressures eventually resulting in the Ship Mortgage Act of 1920. When the war in Europe ended the United States Government owned 1280 ocean-going flag ships. . . . Promptly Congress authorized the dismantling of this fleet and its sale to privately owned shipping lines. . . . It was soon realized, however, that this result could not be accomplished unless considerable new capital could be attracted to the private shipping industry. To this end the Ship Mortgage Act of 1920 was enacted.

Investment in shipping has been frustrated over the years by the absence of an effective security device. The common law mortgage was of little use in the shipping industry because it was not considered by admiralty courts to be a maritime contract. This meant that it would be subordinate to all maritime liens whenever they attached. . . . The Ship Mortgage Act breathed new life into ship mortgages by according them a preference over most subsequently attaching maritime liens. . . . 46 U.S.C.A. § 953 (1958). However, a mortgage was not eligible for this preferred treatment unless the mortgagee was a citizen of the United States, and the term " 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder," was defined as "the trustee designated in such deed." . . . This citizenship requirement, unlike that of the Shipping Act, was absolute and could not be waived by the Secretary of Commerce.

The essential purpose of Congress in enacting the Ship Mortgage Act was to promote ship financing by affording substantial security to investors.

The question of whether or not the purposes of the Shipping and Ship Mortgage Acts will be served by requiring participating lenders under participation agreements to comply with the recording provisions of these Acts, can only be answered after a consideration of the purpose and function of participation agreements. Alan W. Armstrong in "The Developing Law of Participation Agreement," 23 Business Lawyer 689 (1968), provides some insight into the significance of these agreements.

Armstrong explains that participations have developed rapidly in recent years as a means by which larger banks share attractive loans with country banks, join country banks in making large loans to country bank customers, "and as a means of servicing the credit needs of factors, financing institutions and banks anxious to satisfy their customers' credit demands but unable to do so for reasons of lending limit ceilings and other restrictions."

Although the relations among leads and participants are governed by a participation agreement or certificate, in practice the purchaser of a participation buys an undivided share of the loan made by the lead and an undivided share of the collateral which secures the loan.

Regarding the documentary relations between the borrower, lead, and participant, Armstrong says:

. . . the borrower names only the lead as secured party with respect to any assignments, pledges, and chattel mortgages which may be involved. Notes evidencing the borrower's obligation are payable to the lead, and the lead is custodian of all evidences of indebtedness and collateral, save for its own share, in trust for its participants. Proper care of the collateral is entirely the lead's responsibility, and only the lead is liable if the borrower later claims that its collateral was somehow damaged while in the lead's custody.

The author also points out that instruments executed between the borrower and lead usually make no mention of the participant, either as a co-lender or secured party, and that public notices with respect to filings and financing statements, indicate that only the lead is the secured party. Presumably, the latter practice exists because the function of informing the public that a security interest exists relative to a particular chattel is served by naming the leading lender, even though the intricacies of the loan supported by the security interest are not set out.

The author notes that elements of the documentary relations are ignored by the lead and participant lenders for accounting purposes inasmuch as the lead reduces the borrower's indebtedness on its books in the amount of participations sold, while the participants in their accounting procedures report a loan to the borrower in the amount of the participation, even though the borrower's books reflect an obligation to the lead alone. Of course, documentary relations become important in the event of default or bankruptcy of one of the parties.

In the instant case, the participation agreement between First State Bank and American Bank was effectuated because of a lending ceiling imposed by Wisconsin law upon First State Bank. The agreements, one consummated May 15, 1973 for $25,000 and the other concluded May 21, 1973 for $80,000 provided:

This Participation Certificate is given upon the following agreements and conditions: That the sole liability hereunder of [First State Bank] (hereinafter sometimes called "assignor") shall be to distribute to the participant the latter's proportionate share of any payments of principal or interest which assignor may receive on said note or loan; that assignor does not in any way warrant or guar-

antee the genuineness, validity, enforceability or payment of said note or loan, or of the principal or interest thereof, or of any collateral therefor (which latter term as used herein also includes any guarantee or other instrument delivered in connection with said note or loan) ; that assignor is to have custody of said note or loan and collateral, if any, with full authority to conduct and control in assignor's name the collection, utilization and enforcement of said note or loan and collateral by suit, foreclosure, or otherwise; and that in the event assignor should incur any expense or liability in connection with the holding of said note or loan and collateral, if any, or the collection or enforcement therefor, the participant hereunder agrees to pay and indemnify assignor upon demand for the participant's ratable proportion of such expense or liability.

By its terms, the agreement reserves full responsibility for the administration of the loan as well as enforcement proceedings in the event of default to First State Bank, the lead lender.

NMS, citing *Chemical Bank New York Trust Company v. Steamship Westhampton, supra,* argues that American Bank was the transferee of a partial interest in the towboat and as such transferee, it was required to satisfy the Shipping Act requirements, 46 U.S.C. §§ 801–808. American Bank's failure to satisfy this requirement, NMS continues, precludes the mortgage from receiving preferred status under the Ship Mortgage Act. *Steamship Westhampton,* however, addressed the issue of whether a ship mortgage bond was an interest in the mortgaged ship within the meaning of the Shipping Act provisions voiding the transfer to aliens of any interest in an American ship without approval by the Maritime Administration. The Court held that the ship mortgage bond was such an interest. That case is distinguishable from the instant case inasmuch as our task is to determine wheth-

er a participation agreement renders the participating lender a mortgagee whose compliance with the recording requirements of the Ship Mortgage Act is a prerequisite to the preferred status of a mortgage executed by the borrower and the lead lender.

It is undisputed that First State Bank complied with the recording, endorsement, and declaration of citizenship requirements of the Shipping and Ship Mortgages Acts. NMS argues, however, that under the circumstances of this loan, where American Bank provided the greater percentage of funds, American Bank was the principal lender and its failure to comply with the Acts' requirements defeats the preferred status of the mortgage. We disagree.

It is clear from the foregoing discussion that the function of the participation agreement in this case, and the purposes of the Ship Mortgage Act dovetail. Here the agreement provided Inter Marine with loan capital necessary to purchase the towboat, which it intended to use for business purposes. The loan requested by Inter Marine, $130,000, would not have been possible without the participation agreement. The Ship Mortgage Act as pointed out in *Steamship Westhampton, supra,* sought to attract private capital to the shipping industry by according a preference to ship mortgages which met its procedural requirements.

Inter Marine quite properly points out that neither NML nor Lemont acted to its detriment or was misled by the nonappearance of American Bank as a mortgagee,. that the $130,000 mortgage was a matter of public record, and that the appearance of American Bank as mortgagee in Coast Guard documentation would have made no difference in the actions of either of the intervenors.

To hold that participants in a loan, who for other purposes are non-identified parties to loans between a lead lender and borrower, must identify themselves and comply with the requirements of the Ship Mortgage Act to prevent the

destruction of a preferred mortgage given by the borrower to the lead lender, would unnecessarily burden the acquisition of preferred status by lead lenders in these cases, and only detract from the purposes of the Act. Such a result was clearly not intended by Congress. Nor is it required that lead lenders name participants as joint mortgagees, or comply with regulations, 46 C.F.R. 67–49–17, designed to preserve preferred mortgage status, in the case of an assignment, amendment assumption, or novation of a preferred mortgage.

Accordingly, an order will enter denying the motion of NMS for summary judgment and granting First State Bank's motion with respect to the latter's preferred mortgage under the Ship Mortgage Act.

First State Bank will, accordingly, be entitled to priority against the vessel's judicial sale proceeds over all claims against the "Chippewa" except any preferred maritime liens found to exist therein pursuant to 46 U.S.C. § 953(a), (b).