**In re AUTOSTYLE PLASTICS, INC., Debtor.**

**Bankruptcy No. 96–83767.**

United States Bankruptcy Court, W.D. Michigan, Southern Division.

Dec. 31, 1997.

Butzel Long (Thomas B. Radom), Birmingham, MI, and Eckert, Seamans, Cherin & Mellott, L.L.C. (William E. Kelleher, Jr., argued), Pittsburgh, PA, for Bayer Corporation.

Pepper, Hamilton & Scheetz (I. William Cohen, argued and Joel D. Applebaum), De-

troit, MI, for MascoTech and Citicorp Venture Capital, Ltd.

Miller, Johnson, Snell & Cummiskey (Thomas P. Sarb, argued), Grand Rapids, MI, for Venture Industries.

Donovan, Love & Twinney, P.L.C. (Michael W. Donovan, argued), Grand Rapids, MI, for Chapter 7 Trustee.

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

JO ANN C. STEVENSON, Bankruptcy Judge.

After reviewing the papers filed and arguments of counsel, as well as the cases cited therein, the Court denies, in part, and grants in part, the Motion for Summary Judgment of Bayer Corporation. The Court further denies, in part, and grants in part, the Motion for Summary Judgment filed by Masco-Tech and Citicorp Venture Capital, Ltd., joined by the State of Michigan as Custodian for Certain State Retirement Systems. Granting the State's motion in part also effectively denies Bayer's request for default judgment against the State. The net result is denial of Bayer's original request for adequate protection; *i.e.*, direct payment of the Debtor's lease payments to Bayer instead of Venture Industries.

### I. Jurisdiction

This dispute arises in a case referred to this Court by the Standing Order of Reference entered in this District on July 24, 1984, and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K). Accordingly, this Court is authorized to enter a final judgment subject to the right of appeal embodied in 28 U.S.C. § 158(a) in accordance with Fed. R.Bankr.P. 8001 and 8002. The Court hereunder makes no findings of fact but submits its conclusions of law pursuant to Fed. R.Bankr.P. 7052.

### II. The Controversy

The dispute before the Court involves several aged financial transactions. In seeking to improve its current financial position, Bayer has two interdependent arguments. The first is that the late filing of a continuation statement resurrects its previously lapsed security interest in the property of Debtor AutoStyle Plastics, Inc. ("AutoStyle" or "Debtor"). The second attacks the validity of several subordinated participation agreements. The Court has not been provided with sufficient information to dispose of the validity issue completely, but is able to dispense with the equitable subordination and marshaling arguments. To better understand the context in which these arguments are presented, we first review the Debtor's pre- and post-bankruptcy financial history.

### III. The Relevant Pre–Bankruptcy Financial History of AutoStyle

AutoStyle was originally incorporated as C & F Stamping, Inc. in the early 1960s. AutoStyle produced automobile trim parts by a process known as reaction injection molding. Bayer Corporation's predecessor, Mobay, and then Bayer itself supplied the chemicals used in that process.

On March 16, 1982, AutoStyle entered into a long term credit facility, consisting of a revolving loan and a term loan, with CIT Group/Credit Finance, Inc. ("CIT"), formerly known as Trefoil Capital Corporation. The CIT credit facility was secured by a first priority, properly perfected lien in substantially all of AutoStyle's assets. On or about March 11, 1982 CIT filed with the Michigan Secretary of State a UCC–1 financing statement covering, *inter alia*, AutoStyle's inventory, equipment and accounts receivable.

In August, 1982, Bayer, obtained a security interest, junior in priority to CIT's lien, in "all Debtor's inventory, equipment, and accounts receivable, now existing or hereafter acquired, substitutions therefor, and all proceeds, from sale or other disposition of the collateral."

Bayer perfected its security interest by recording a UCC–1 financing statement with the Michigan Secretary of State on August 3, 1982. However, that security interest lapsed on August 3, 1987, because Bayer had not filed a continuation statement within the period specified by M.C.L.A. 440.9402(2). On November 5, 1987, Bayer filed another financing statement with the Michigan Secretary of State. This one stated that it was "a

continuation of file No. B3580543 of August 3, 1982." [1]

On November 23, 1987, NBD Business Finance, Inc. and CIT (then known as Fidelcor Business Credit Corporation) entered into a Participation Agreement with respect to CIT's credit facility with the Debtor.

The following day, November 24, 1987, CIT entered into a Participation Agreement with Signet Bank/Virginia.

● On December 1, 1987, CIT entered into a Subordinated Participation Agreement with Citicorp Venture Capital, Ltd. ("Citicorp"). On August 11, 1988, Citicorp and CIT amended their December 1, 1987 Subordinated Participation Agreement to increase Citicorp's participation interest from $2 million to $4.5 million.

● On January 12, 1988, CIT entered into a Subordinated Participation Agreement with the Treasurer of the State of Michigan, as Custodian for Certain Retirement Systems ("State").

On September 30, 1988, AutoStyle entered into a loan agreement with Mellon Bank whereby Mellon loaned $4 million to enable AutoStyle to purchase certain equipment. Although the Mellon loan was unsecured, it was guaranteed by Bayer, and Bayer collateralized its guarantee with a security agreement dated September 30, 1988. That agreement granted a lien in certain of the Debtor's machinery and equipment, second in priority to CIT's existing lien. Bayer perfected its security interest in the machinery and equipment by recording a UCC–1

financing statement with the Michigan Secretary of State on November 4, 1988.

On or about November 29, 1988, Masco-Tech (then known as Masco Industries, Inc.) purchased one-half of the common stock of AutoStyle, Inc., the Debtor's parent corporation, for $10 million. Also on or about November 29, 1988, MascoTech loaned the Debtor $26.8 million, and secured its loan with a properly perfected lien on all assets subordinated to pre-existing perfected liens.

● On March 19, 1990, MascoTech and CIT entered into a Subordinated Participation Agreement and an Amendment to that Subordinated Participation Agreement. [2]

The transactions highlighted above are the gravamen of Bayer's Motion for Summary Judgment.

### IV. Why Bankruptcy? [3]

Because of the size and complexity of this case, it is helpful to discuss why AutoStyle chose to file Chapter 11. Prior to filing bankruptcy, AutoStyle engaged in a massive effort to sell its business and its assets in place as a going concern. Although it negotiated with numerous potential buyers, no offers were forthcoming. The Debtor also determined that it could not reorganize and confirm a "stand alone" plan of reorganization that contemplated an on-going business. In light of these facts, AutoStyle determined that it would have no choice but to commence a bankruptcy proceeding to liquidate its assets.

---

**1.** The Court concludes that the purported continuation of the already-lapsed statement did not cure the lapse of Bayer's security interest. As MascoTech and Citicorp correctly point out in their joint reply brief, the late filing of a continuation statement does not resurrect a lapsed security interest. *In re Gordon Square Pharmacy, Inc.*, 138 B.R. 533 (Bankr.N.D.Ohio 1992); *NBD Bank, N.A. v. Timberjack, Inc.*, 208 Mich.App. 153, 527 N.W.2d 50 (1995). It is interesting to note that Bayer again failed to file a continuation statement of this second financing statement within the statutory time limit. While much is made of this argument, we find it to be of no use in resolving the current dispute.

**2.** Pursuant to the September 30, 1997 Scheduling Order, the parties filed a stipulation of facts, which the Court hereby accepts. That stipula-

tion entitled, "Joint Stipulation of Undisputed Material Facts Regarding Cross–Motions for Summary Judgment" is appended to this opinion. The Court has paraphrased the facts as stated in the Joint Stipulation. In it, the parties simply state that each of these transactions occurred, with documents bearing the dates stated above. Because we have seen no evidence that these transactions occurred on dates other than those stipulated as appearing on the documents, we find that the transactions occurred on the dates indicated.

**3.** In drafting this section, the Court has borrowed heavily from the Motion of Debtor for Order Authorizing Assumption of Executory Contract, Leases and Sub-leases and Request for Expedited Hearing, filed on June 3, 1996.

Liquidation, however, presented serious problems. Because AutoStyle was a "single source" supplier to General Motors Corporation (among others), it feared that any interruption in its production schedules might result in a shut down of certain assembly lines while GM and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies. In turn these shut downs might cause the layoff of innumerable employees of GM and Debtor's other customers. AutoStyle further predicted that interruption of the customers' production schedules would cause the customers to claim various offsets or recoupment to their outstanding accounts receivable. The offsets and/or recoupment would be so significant as to result in the erosion or elimination of the accounts receivable to the detriment of the Debtor and its estate. The Debtor calculated that a shut down of a GM assembly line could result in a damage claim by GM and an offset against outstanding GM accounts receivable in excess of $9 million per day.

If AutoStyle simply ceased production and filed a Chapter 7 bankruptcy proceeding, it estimated that it would take GM a minimum of two weeks to find a new supplier for the parts it had supplied, retool, and resume production. Therefore, the Debtor estimated that GM's claim against it would be in the range of $100 million to $140 million, not including other consequential damages. AutoStyle estimated that liquidation would not result in sufficient funds to pay off its first secured creditor. No distribution would have been available to junior secured creditors or unsecured creditors and all of AutoStyle's employees would have been terminated immediately.

If, rather than simply closing down and filing Chapter 7, the Debtor had chosen to operate for some period of time in order to maintain its production schedules, damage to its customers and accounts receivable would be minimized somewhat. Nevertheless, to preserve the value of certain assets, the Debtor would have sustained operating losses in order to maintain production through July 15, 1996. In order to fund these losses and maintain adequate production levels, the Debtor would have had to obtain debtor-in-possession financing under 11 U.S.C. § 364 from MascoTech, a shareholder of Debtor's parent corporation, and possibly others. Although MascoTech indicated a willingness to fund a limited operation for the purpose of preserving some of the Debtor's assets, in return it would have obtained a lien in all of the Debtor's assets. In any event, funding the Debtor's operating losses would not have resulted in any distribution to unsecured creditors, would not have preserved jobs, nor entirely eliminated the potential damage to Debtor's customers.

Shortly before it filed its petition, however, a third alternative presented itself. Prior to filing, AutoStyle entered into an agreement to lease those assets which it owned, and to sub-lease those assets which it leased, to Venture Industries Corporation ("Venture"). Under the Agreement, Venture leased and/or sub-leased the assets for a period of two years. The monthly base rent was $500,000 paid weekly, less any sums paid to third party lessors of the Debtor pursuant to new leases between Venture and the lessor, plus additional amounts provided in the Agreement. The Agreement obligated Venture for all taxes, insurance and maintenance of the leased/sub-leased property. It gave Venture an option to purchase the assets of the Debtor at the end of the two-year lease term, with a method for calculating the option price. The Agreement also provided that Venture would purchase the Debtor's inventory, work-in-process and raw materials. Venture would continue to employ all of the Debtor's current employees, but Venture would not be obligated to continue their employment as long as it assumed certain specified termination costs. Under the Agreement, the Debtor retained its insurance refunds, accounts receivable arising prior to the effective date of the Agreement, its cash on hand and on deposit, customer-owned machinery, equipment and tooling, all pre-paid expenses and deposits, tax refunds, claims and causes of action and a grant from the State of Michigan. The Agreement was made subject to higher and better offers.

Under the Agreement, the Debtor's senior secured creditor would be paid in full and

junior secured creditors would likely receive full payment on the secured portion of their claim under Bankruptcy Code § 506. In addition, the Debtor anticipated that it would have sufficient money available to make a distribution to unsecured creditors and be able to propose and promptly confirm a liquidating plan. The Debtors' employees would keep their jobs and customers would continue to have their production schedules met, thereby eliminating potential damage claims resulting from customer assembly line shut downs. The Debtor's assets would continue to be productive and to generate tax revenue.

Taking all this into account, AutoStyle filed Chapter 11 on June 3, 1996. The Court approved the arrangement with Venture Industries by order dated June 7, 1996. The case was subsequently converted to Chapter 7 on July 30, 1996.

On February 27, 1997, Bayer filed a Motion for Adequate Protection. On August 8, a scheduling order was issued providing that Bayer's motion would be treated as an adversary proceeding pursuant to Fed.R.Bankr.P. 7001(2). The motions now before the Court are cross motions for summary judgment on that claim for adequate protection.

### V. Summary Judgment Standard

Rule 7056 of the Federal Rules of Bankruptcy Procedure provides that Rule 56 F.R.Civ.P. applies in adversary proceedings. Rule 56 F.R.Civ.P.(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In deciding the motion, the court is required to make all reasonable inferences in favor of the party opposing summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986); *See also, Street v. J.C. Bradford & Company,* 886 F.2d 1472 (6th Cir.1989) and *In re Auto Specialties Manufacturing Company (Boyd v. Manufacturers National Bank of Detroit),* 153 B.R. 457 (Bankr. W.D.Mich.1993), *adopted in part, In re Auto Specialties,* 153 B.R. 503 (W.D.Mich.1993).

### VI. Bayer's Arguments

Bearing in mind that the issues now before the Court began as Bayer's Motion for Adequate Protection, we were not surprised to find that the Motion for Summary Judgment filed by MascoTech and Citicorp is essentially an opposition to Bayer's Motion for Summary Judgment. Similarly, the Motion for Summary Judgment filed by the State of Michigan joins in the MascoTech and Citicorp motions.[4]

Bayer's Motion consists of three arguments: (1) that the designated MascoTech, Citicorp, and State of Michigan participation agreements are invalid; (2) that the claims of MascoTech, Citicorp and the State should be equitably subordinated to Bayer's claims; and (3) that the Court should apply the marshaling doctrine and require MascoTech, Citicorp and the State to look to other collateral for repayment of the Debtor's obligations to them. We address each of these arguments in turn.[5]

#### 1. *The Validity of the Subordinated Participation Agreements*

The Subordinated Participation Agreements in dispute are the three agreements highlighted in Section III above: The December 1, 1987 Subordinated Participation Agreement between CIT and Citicorp Venture Capital (amended August 11, 1988); the January 12, 1988 Subordinated Participation Agreement between CIT and the State of Michigan as Custodian for Certain State Retirement Systems; and the March 19, 1990

**4.** The State of Michigan's Motion also asks the Court to deny an earlier Bayer motion seeking a default judgment; this request is hereby granted.

**5.** Bayer also argues that the claims of Masco-Tech, Citicorp and the State should be reclassified as equity rather than debt. As noted in the Reply Brief in Support of Motion for Summary Judgment filed by MascoTech and Citicorp, the

Court need not address this argument, because a bankruptcy court has no authority to reclassify claims pursuant to the tax cases cited by Bayer. The sole basis for reclassifying claims is 11 U.S.C. Section 510(c). *See In re Pacific Express, Inc.,* 69 B.R. 112, (9th Cir. BAP 1986), vacating bankruptcy court's reclassification of debt into equity in reliance on tax cases.

Subordinated Participation Agreement between CIT and MascoTech.

In order to have priority over MascoTech, the State of Michigan, and Citicorp, Bayer must prove these subordinated participation agreements invalid. All parties agree that CIT had a first position in AutoStyle's assets pursuant to loans CIT made the Debtor. By purchasing participation interests, Masco-Tech, Citicorp and the State share CIT's first priority. Only by invalidating these agreements can Bayer prevent these participating creditors from benefitting from CIT's first position.

Counsel have directed the Court's attention to three cases that discuss participation agreements. *Natwest USA Credit Corp. v. Alco Standard Corp.* 858 F.Supp. 401 (S.D.N.Y.1994) essentially enforced a participation agreement, finding that the participants were entitled to payment before a borrower's loan guarantor was entitled to repayment of funds paid pursuant to the guaranty.

*Natwest* describes a participation as:

a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender; the lender utilizes the funds to make its loans to the borrower. The participant is not a lender to the borrower and has no contractual relationship with the borrower. The participant, by purchasing a participation in the lender's loans to the borrower, obtains the benefits of the lender's security interest and priority of payment.

*Id.* at 407–408.

Natwest lent money to Toscany, an import company formed to purchase the imports division of Alco. Alco guaranteed Toscany's obligations on some of the Natwest loans. Another lender, Westinghouse, also provided Toscany with some of the funds for the acquisition and operation of the imports division.

*Natwest* was an interpleader action. The interpleader funds were monies Natwest received from Toscany, or proceeds from the loan collateral. The dispute arose when Natwest received more than its share of the loan proceeds from Toscany. Under the terms of a participation agreement between Natwest and Westinghouse, Natwest was to pay any such excess to Westinghouse. Because Alco had made payments pursuant to its guaranty, however, Alco also claimed it was entitled to the excess funds. The *Natwest* court ultimately held that the participation agreement was entitled to priority over the guaranty. Citing to the trial transcript, the *Natwest* court stated, "Among professionals in the corporate finance field, it is generally understood and accepted that the participant in a loan is to be repaid for its participation before the guarantor is repaid for monies extended pursuant to the guaranty." *Natwest, supra* at 409.

The *Natwest* participation agreements specifically provided an order of repayment. *See Natwest, supra* at 407, finding no. 41. The instant loan documents do not provide as to who the debtor may pay first.

The *Natwest* court also found that Westinghouse had a specific understanding about the order of repayment under the participation agreement, and that Westinghouse would not have entered the participation agreement if it had been told that the loan guaranty would be paid ahead of the participation agreement.

Westinghouse entered into the Participation Agreement with the understanding that it would be repaid for the entire amount of its Participation before Alco would be repaid for the monies that it paid pursuant to the Guaranty.... If Westinghouse had been told that Alco would be repaid for its Guaranty before Westinghouse was repaid for its Participation, Westinghouse would not have approved the Participation Agreement, or would have insisted that the Participation Agreement be for an amount less than [the amount of Westinghouse's actual participation].

*Id.*

■ The second case involving participation interests cited by counsel is *In re Coronet Capital Co.*, 142 B.R. 78 (Bankr. S.D.N.Y.1992). In *Coronet*, the participant purchased a $500,000 senior participation in-

terest in a secured loan made by the debtor to a third party. The trustee opposed the participant's motion for relief from the automatic stay as to the collateral securing the underlying loan. Relying on *Matter of Yale Express System, Inc.*, 245 F.Supp. 790 (S.D.N.Y.1965) for its definition of "participation agreement," Judge Conrad instructed,

> A true participation agreement is one that: a) money is advanced by participant to a lead lender; b) a participant's right to repayment only arises when a lead lender is paid; c) only the lead lender can seek legal recourse against the borrower; and d) the document is evidence of the parties' true intentions.

*Coronet Capital,* supra at 82.

The resolution of the validity issue turns on the application of the tenets of *Coronet Capital.* Our difficulty in applying those tenets, however, is heightened by the fact that all three transactions (the MascoTech, Citicorp and State subordinated participation agreements) are bundled together in these motions. Whether by inadvertence or strategy, counsel for Bayer as well as counsel representing MascoTech, Citicorp and the State, have failed to delineate the factual circumstances surrounding each individual transaction. And our attempt to unravel the three has not been aided by the joint stipulation of facts.

Based on the information we have been provided and the Court's understanding of the law, we now attempt to overcome this deficiency.

We address the *Coronet Capital* tenets in reverse order. We do not believe that there is any argument that, in each of the three subordinated participation agreements, the participant's right to repayment only arises when a lead lender is paid. In point of fact the only reason this dispute is now before the Court is that, lead lender CIT having been paid in full, the question is who now is entitled to the rent Venture continues to pay pursuant to the lease agreement sanctioned by the Court's June 7, 1996 order.

Neither the participants nor Bayer contend that any entity other than lead lender CIT could seek legal recourse against Debtor AutoStyle pursuant to the funds transferred to CIT, if any, in connection with the subordinated participation agreements. Having reviewed them, we are not persuaded that any of the three subordinated participation agreements provide that the participants could look to AutoStyle for payment of whatever funds, if any, were transferred to CIT. As further support for this conclusion, Bayer has not argued that MascoTech, Citicorp, or the State has filed claims against Debtor AutoStyle's estate. And in fact, the Court has thoroughly reviewed the AutoStyle claims docket and confirms that no claims have yet been filed by the participants.

As noted by counsel for MascoTech at oral argument, the documents themselves provide evidence of "the intention of the parties to treat these as clearly participations... a label should not be definitive in the eyes of the law in terms of whether or not a document is entitled to enforcement, but where the rights and duties and obligations of the parties described in those documents match the legal standard by which you measure whether a document should be treated in terms of what it is labeled, it seems to me that it's inescapable that these are clearly participation agreements." [Transcript of September 30, 1997 hearing at p. 42, 1. 5–16]. The documents provided to the Court are each entitled, "Subordinated Participation Agreement." The parties' joint stipulation of facts refers to them as "subordinated participation agreements" and "participation agreements." The Court is satisfied that the transactions were intended to be participations.

■ *Coronet* offers further guidance to resolving this problem by delineating those factors indicating an intention to create a loan between alleged participants and a lead lender thus making that relationship one of debtor-creditor. Those factors include the following:

> 1) guarantee of repayment by the lead lender to a participant; 2) participation that lasts for a shorter or longer term than the underlying obligation; 3) different payment arrangements between borrower and lead lender and lead lender and participant; and, 4) discrepancy between the in-

terest rate due on the underlying note and interest rate specified in the participation. *Hutchins, What exactly is a Loan Participation?,* 9 Rut.Cam.L.J. 447, 460 (1978). 142 B.R. at 80.

To the best of our recollection, Bayer never argued that any of those factors exist here. And we have not found any of those factors in our review of the submitted documents.

We are now left with the most troubling part of the analysis required by *Coronet Capital:* to wit, whether each of the participants advanced money to CIT pursuant to the terms of their individual agreement. We have combed the record, particularly the joint stipulation of facts, for such evidence. Neither counsel has pointed to anything in the record nor has the Court found any evidence to support a finding that either the State or MascoTech actually made such advances.

With regard to the Citicorp agreement, during oral argument, counsel for MascoTech and Citicorp cited an interrogatory response claiming to evidence the wire transfer of funds from Citicorp to CIT. [Transcript p. 39, 1.17–p. 40, 1.17]. Although counsel argued that this response also evidences that the State and MascoTech advanced funds, the actual interrogatory response as read by counsel would support a finding that only Citicorp advanced funds. [Transcript, p. 40, 1. 9–12, stating, "CVC funded the participation agreements dated December 1, 1987 and August 3 [*sic, August 11*], 1988 by wire transferring funds to CIT on that date."

Counsel's argument, however, is not evidence. *See, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, n. 9, 101 S.Ct. 1089, 1095, n. 9, 67 L.Ed.2d 207 ("an articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.") For some reason, neither Bayer's interrogatories nor Citicorp's answers thereto have been filed with the Court, and thus are not part of the record.

■ The third participation agreement case we consider is *In re S.O.A.W. Enter-*

*prises, Inc.,* 32 B.R. 279 (Bankr.W.D.Tex. 1983). In accord with *Coronet Capital* and *In re Woodson Co.,* 813 F.2d 266, 271 (9th Cir.1987), S.O.A.W. holds that one feature of a true participation agreement is that both the lead lender and the participant rely on the credit worthiness of the underlying borrower for repayment of the obligation.

The Court is satisfied that both lead lender CIT, and participants MascoTech, Citicorp and the State relied on the creditworthiness of underlying borrower AutoStyle. The agreements therefore, have one feature of a 'true' participation agreement under the *S.O.A.W. Enterprises* standard.

The additional evidence before the Court which bears on the validity or enforceability of the participation agreements is the affidavit of Richard H. Daniel, submitted by Bayer. Mr. Daniel states that "In my over 40 years of dealing with commercial loans, including many troubled situations at three different banks, I have never seen a transaction of the type described in the 'Subordinated Participation Agreements.' It is highly unusual, to say the least, for shareholders or insiders to participate in a senior credit facility....it is not a normal participation agreement, and is not a usual or customary lending practice." [Daniel Affidavit, at para. 7]. Mr. Daniel's affidavit, however, does not persuade the Court that the Subordinated Participation Agreements are not "participations" or are otherwise invalid. The fact that Mr. Daniel may find these participation agreements unusual does not require that the Court conclude that they are invalid. We are compelled to point out that Bayer had notice both of the participation agreements, and of CIT's first priority security interest which provided for future lending. The Court is satisfied that Bayer had adequate notice of the fact that CIT held a first priority interest and indeed knew something about the existence of lenders other than CIT. Whether Bayer knew all the details of the Subordinated Participation Agreements is immaterial. As counsel for MascoTech and Citicorp stated,

> [Bayer] essentially tr[ies] to challenge the validity of the participation by urging that their own lack of familiarity with the de-

tails of the underlying participation agreements somehow equates to being misled or being defrauded or being deceived. And, in fact, this is not a situation of silence or omission. The documents, the meetings between the parties and all of the evidence that is before the Court undisputed clearly show that Bayer not only knew of the participation agreements by the shareholders, but if they had wanted to get more detail, they could have inquired. Apparently they chose not to do that. Why, we don't know. [Transcript p. 47 1. 12–24.]

Notwithstanding the above, it appears that due to the state of the record, the Court is unable to fully decide the validity issue because an essential element is missing; to wit, evidence of transfers to lead lender CIT from each of the participants pursuant to the three designated Subordinated Participation Agreements.

### 2. *Equitable Subordination*

■ Bayer next argues that the Court should apply the doctrine of equitable subordination and give Bayer's claims priority over the claims of MascoTech, Citicorp and the State. Because the Court finds that there has been no inequitable conduct connected with the participation agreements, the doctrine of equitable subordination does not apply.

■ Bayer asks the Court to equitably subordinate claims arising from the Subordinated Participation Agreements, which were struck at a time (late 1987 and 1988) when Bayer was not even a secured creditor of the Debtor. Any security interest based on Bayer's August 1982 financing statement lapsed when Bayer failed to file a continuation statement within the statutory time period. Bayer's argument is rather difficult to follow. First, Bayer argues that the transactions were inequitable but does not state exactly how Bayer was injured. Next, Bayer says it does not need to show inequitable conduct, arguing that "the trend in recent cases is . . .

moving away from any strict requirement that there be inequitable conduct, as the courts acknowledge the need to assess the equities without necessarily assigning fault or culpability." Even if we were to lean towards adopting what Bayer describes as a trend toward a finding of no inequitable conduct (which it is not ),[6] Bayer's argument still fails.

Bayer cites *In re Kids Creek Partners, L.P.,* 200 B.R. 996 (Bankr.N.D.Ill.1996). Bayer insinuates that this case also stands for the proposition that parties to the Subordinated Participation Agreements bear the burden of showing that the transactions were in good faith and fair to Bayer. Switching tacks one more time, Bayer argues that the failure to disclose the subordinated participation interests when Bayer agreed to guarantee the Mellon Bank debt in September 1988 constitutes inequitable conduct.

■ We are not persuaded by any of these arguments. First, as participations are not separate loans, they need not be disclosed and do not require the filing of separate financing statements. *First State Bank v. Towboat Chippewa,* 402 F.Supp. 27 (N.D.Ill. 1975); *In re Fried Furniture Corp.,* 293 F.Supp. 92, 93 (E.D.N.Y.1968); *aff'd,* 407 F.2d 360 (2d Cir.1969). What must be disclosed, and what was disclosed here, was the prior secured position of CIT. Both the CIT credit facility and the total amount of advances thereunder, including all participation interests, were fully disclosed. If Bayer wanted additional information, it could have obtained the CIT loan documents as part of its due diligence. Apparently Bayer chose not to do so.

Interestingly, Bayer was put on notice of the participation interests of MascoTech, Citicorp and the State. The Debtor's audited financial statement for the year ending 1988 stated: "The lender [CIT], under the Agreement described above, and certain shareholders of the Company arranged for the Company to borrow $2,935,252 in addition to the

---

**6.** This Court's views on equitable subordination claims in the context of summary judgment are laid out in *In re Auto Specialties Manufacturing Company (Boyd v. Sachs),* 153 B.R. 457 (Bankr. W.D.Mich.1993), *aff'd,* slip op. (W.D. Mich. April 11, 1994) (No. 1:93–CV–759). To state a claim for equitable subordination relief, Bayer must show misconduct by the parties to the participation agreements.

borrowings described above, under the same terms and conditions, using the same assets to collateralize such borrowings." This disclosure also appeared in every audited financial statement issued by the Debtor thereafter. Bayer had sufficient notice, even though notice of the participation interests was not required by law.

### 3. *Marshaling*

 Finally, Bayer argues that the Court should apply the marshaling doctrine and require MascoTech, Citicorp and the State to look to other collateral for repayment of the Debtor's obligations to them. This argument fails for lack of an essential component. The marshaling doctrine applies only where there are multiple claimants to a common fund and one, but not all, of those claimants also has a claim on a second fund. Where it is possible to do so, the marshaling doctrine seeks to do equity by requiring the claimant who may recover from the second fund to look to that fund, rather than seeking compensation from the fund subject to multiple claims. Marshaling requires a second fund or collateral. Here, Bayer has not shown that MascoTech, Citicorp and the State have access to any such alternate source of repayment.

### VII. Conclusion

 When all is said and done and the many briefs analyzed and reanalyzed, it appears to the Court that this may be a case of "much ado about nothing." In attempting to invalidate the March 19, 1990 Masco-Tech/CIT subordinated participation agreement, Bayer makes much of the fact that MascoTech is an insider due to the November 29, 1988 transaction wherein MascoTech purchased one half of the common stock of Debtor's parent corporation, AutoStyle, Inc. However, Bayer has pointed to no law, nor did the Court's independent research find any, in support of the contention that otherwise valid participation agreements become invalid merely because a participating creditor is an insider. Such a conclusion borders on the bizarre, especially under the circumstances now before the Court. Bayer had notice before it determined to again lend

money. In deciding to extend further "secured" credit, it is undisputed that Bayer always knew that it was second to CIT's first position and that CIT had the ability and the right to enter into participation agreements. In fact, it should be immaterial to Bayer as to with whom those participation agreements were executed. Bayer always knew it would be second to such loans, but still decided to lend. It is possible that Bayer decided to make the further loans to AutoStyle because it had twice failed to perfect its security interest in previous loans and was optimistic that it could recoup some of those expected losses with the interest rate it hoped to collect on this third transaction. In any event, we have seen nothing that persuades us that Bayer's position as to insiders is correct.

For the reasons stated above,

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. As to the issues of equitable subordination and marshaling, the Court GRANTS the Motion for Summary Judgment filed by MascoTech, Citicorp Venture Capital, Ltd., and the State of Michigan as Custodian for Certain Retirement Systems and thereby DENIES the Motion for Summary Judgment of Bayer Corporation as to the issues of equitable subordination and marshaling.

2. On or before 4:30 p.m. on Monday, January 19, 1998, counsel for MascoTech, Citicorp Venture Capital, Ltd., and the State of Michigan as Custodian for Certain Retirement Systems shall file with the Clerk of the United States Bankruptcy Court and serve upon counsel for Bayer a pleading entitled "designation of the record" stating where in the record currently before the Court evidence exists as to those transfers made between MascoTech, Citicorp Venture Capital, Ltd., and the State of Michigan pursuant to the three participation agreements at issue.

3. On or before 4:30 p.m. on Monday, February 9, 1998, counsel for Bayer shall, if appropriate, file with the Clerk of the United States Bankruptcy Court and serve upon opposing counsel, a response to the designation of record.

4. If no designation of the record is timely filed and served as indicated above, the Court will give counsel adequate notice of a telephonic status conference to be scheduled at the convenience of counsel by the Court to discuss further proceedings in this matter.

IT IS FURTHER ORDERED that a copy of this Opinion and Order on Motions for Summary Judgment shall be served by Federal Express upon William E. Kelleher, Jr., and I. William Cohen, Esq., and by first-class United States mail upon Thomas B. Radom, Esq., Joel D. Applebaum, Esq., Thomas P. Sarb, Esq., and Michael W. Donovan, Esq.

## JOINT STIPULATION OF UNDISPUTED MATERIAL FACTS REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

Pursuant to this Court's Scheduling Order dated September 30, 1997, MascoTech, Inc. ("MascoTech"), Citicorp Venture Capital, Ltd. ("CVC"), and Bayer Corporation ("Bayer") hereby stipulate to the following undisputed material facts regarding the Cross–Motions for Summary Judgment in this matter, without prejudice to the parties' right to assert the existence of additional undisputed facts:

1. The Debtor, AutoStyle Plastics, Inc. ("AutoStyle" or "Debtor"), filed its voluntary Chapter 11 petition on June 3, 1996.

2. The case was converted to Chapter 7 on July 30, 1996, and Elizabeth C. Chalmers was appointed Chapter 7 Trustee.

3. The Debtor was originally incorporated as C & F Stamping, Inc. in the early 1960's.

4. On March 16, 1982, the Debtor entered into a long term credit facility, consisting of a revolving loan and term loan, with CIT Group/Credit Finance, Inc. ("CIT"), f/k/a Trefoil Capital Corporation. The CIT credit facility was secured by a first priority, properly perfected lien in substantially all of the Debtor's assets. CIT filed a UCC–1 financing statement covering, inter alia, the Debtor's inventory, equipment and accounts receivable with the Michigan Secretary of State on or about March 11, 1982.

5. In August 1982, Bayer, f/k/a Mobay Corporation, obtained a security interest, junior in priority to CIT's lien, in "all Debtor's inventory, equipment, and accounts receivable, now existing or herafter acquired, substitutions therefor, and all proceeds, from sale or other disposition of the collateral." Bayer perfected its security interest by recording a UCC–1 financing statement, quoted above, with the Michigan Secretary of State on August 3, 1982. Bayer's financing statement lapsed on August 3, 1987, as a result of Bayer's failure to file a continuation statement within 6 months before the expiration of 5 years after the August 3, 1982 filing date as required by M.C.L.A. 440.9402(2).

6. On November 5, 1987, Bayer recorded a UCC–1 financing statement with the Michigan Secretary of State, stating: "all Debtor's inventory, equipment, and accounts receivable, now existing or herafter acquired, substitutions therefor, and all proceeds, from sale or other disposition of the collateral. This UCC–1 is a continuation of file No. B3580543 of August 3, 1982." Bayer did not file a continuation statement with respect to this filing, and Bayer's financing statement lapsed on November 5, 1992.

7. NBD Business Finance, Inc. and CIT (then known as Fidelcor Business Credit Corporation) entered into a Participation Agreement dated November 23, 1987 with respect to CIT's credit facility with the Debtor.

8. Signet Bank/Virginia and CIT (then known as Fidelcor Business Credit Corporation) entered into a Participation Agreement dated November 24, 1987 with respect to CIT's credit facility with the Debtor.

9. CVC and CIT (then known as Fidelcor Business Credit Corporation) entered into a Subordinated Participation Agreement dated December 1, 1987.

10. The Treasurer of the State of Michigan, as Custodian for certain retirement systems ("SMRS") and CIT (then known as Fidelcor Business Credit Corporation) entered into a Subordinated Participation Agreement dated January 12, 1988.

11. Pursuant to an amendment dated August 11, 1988, CVC and CIT amended their December 1, 1987 Subordinated Participation Agreement to increase CVC's participation interest from $2 million to $4.5 million.

12. The Debtor and Mellon Bank ("Mellon") entered into a loan agreement dated September 30, 1988, whereby Mellon loaned the Debtor $4 million to purchase certain equipment. Although the Mellon loan was unsecured, it was guaranteed by Bayer, and Bayer collateralized its guarantee with security agreement dated September 30, 1988 granting a lien in certain of the Debtor's machinery and equipment, second in priority to CIT's existing lien. Bayer perfected its security interest in the machinery and equipment by recording a UCC–1 financing statement with the Michigan Secretary of State on November 4, 1988, and with the Clerk of Kent County, Michigan.

13. On or about November 29, 1988, MascoTech (then known as Masco Industries, Inc.) purchased one-half of the common stock of Autostyle, Inc., the Debtor's parent corporation, for $10 million. Also on or about November 29, 1988, MascoTech loaned the Debtor $26.8 million, and secured its loan with a properly perfected lien on all of the Debtor's assets subordinated to pre-existing perfected liens.

14. MascoTech and CIT (then known as Fidelcor Business Credit Corporation) entered into a Subordinated Participation Agreement dated March 19, 1990. Pursuant to an amendment dated March 19, 1990, CVC and CIT amended their Subordinated Participation Agreement.